**CHARTER FEDERAL SAVINGS BANK, 110 Piedmont Avenue, P.O. Box 668, Bristol, Virginia 24203, Plaintiff,**

v.

**DIRECTOR, OFFICE OF THRIFT SUPERVISION, in his own official capacity and as successor in interest to Federal Home Loan Bank Board, and Federal Deposit Insurance Corporation, in its own capacity and as successor in interest to Federal Savings and Loan Insurance Corporation, Defendants.**

**Civ. A. No. 91–0012–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Aug. 16, 1991.

Thomas M. Buchanan, Eric W. Bloom, Michael L. Sibarium, Washington, D.C., James P. Jones, Bristol, Va., for plaintiff.

Aaron B. Kahn, Harvey Levin (OTS), Washington, D.C., Felicia L. Chambers, Dept. of Justice, Fed. Programs, Washington, D.C., Thomas A. Schulz (FDIC), Washington, Julie M. Campbell, Asst. U.S. Atty., Abingdon, Va., for defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

## BACKGROUND

The history that led to this litigation began with the savings and loan crisis in the late 1970s and early 1980s. The government agencies charged with dealing with the crisis were the predecessors to the defendants in the present case. The Federal Home Loan Thrift Board (FHLBB) was charged with regulating the thrift industry, a function that is now performed by a defendant in this suit—The Office of Thrift Supervision (OTS). One of the responsibilities of the FHLBB was to keep the industry solvent, which it attempted to do by establishing and enforcing minimum capital standards. The government had a special interest in keeping the industry solvent because it insured most of the deposits in the nation's thrifts. Insuring these accounts was one of the responsibilities of the Federal Savings and Loan Insurance Corporation (FSLIC), which operated under the authority of the FHLBB and was succeeded by the other defendant in this suit—The Federal Deposit Insurance Corporation (FDIC).

Another responsibility of the FSLIC was to assist troubled thrifts, a job that became more difficult as the savings and loan crisis emerged. The authority of the FSLIC to help these thrifts came from regulations and resolutions passed by the FHLBB. The measures taken by the FSLIC would vary according to the context. Some thrifts might be so insolvent that they would have to be put into receivership and liquidated, and the funds of the FSLIC would be used to pay off the insured depos-

its. Other troubled thrifts were healthy enough to avoid the necessity of liquidation. In these cases, the FSLIC would play a key role in the transactions by searching for healthier thrifts as prospective acquirers. The FSLIC had an obvious interest in finding them since its insurance fund was ultimately at stake in the event that its search failed. When the FSLIC found a prospective acquirer, it might still be required to expend its funds by offering cash assistance for the merger in order for the new thrift to meet the FHLBB's capital standards. The present litigation arose from plaintiff's acquisition of several troubled thrifts under the supervision of the FSLIC as described above.

One way for a healthy thrift to acquire a troubled thrift under the supervision of the FSLIC and take on its liabilities without violating the FHLBB's capital standards, was to employ an accounting device called "supervisory goodwill". This accounting device was included in a collection of accounting standards and principles known as "generally accepted accounting principles" (GAAP). The amount of the acquired thrift's liabilities that exceeded the amount of its assets was labeled "supervisory goodwill" and treated as an asset to be amortized. By employing this accounting device, the parties could turn liabilities into an intangible asset called supervisory goodwill and thereby satisfy the FHLBB's capital standards.

The source of authority permitting the use of supervisory goodwill were the resolutions and regulations of the FHLBB. In 1974, the FHLBB issued Memorandum R–31a which permitted the use of goodwill arising from an acquisition if it was amortized within 10 years. In 1981, the FHLBB issued Memorandum R–31b which extended the maximum permissible amortization period to 40 years. According to Carl O. Kamp Jr., President of the Federal Home Loan Thrift of Atlanta between 1973 and 1988, the FHLBB realized by the late 1970s and early 1980s that the FSLIC did not

have enough funds to liquidate the increasing number of troubled thrifts or offer cash assisted mergers. It therefore resorted to inviting healthy thrifts to merge with troubled thrifts and telling the prospective acquirers that capital standards could be met by using supervisory goodwill under GAAP. Affidavit of Carl O Kamp Jr. at 1, 2. See also the affidavit of John Walker at 2.[1] Certain employees of the Federal Home Loan Bank of Atlanta acted as agents of the FHLBB and asked plaintiff to consider several mergers with troubled thrifts during the 1980s. Affidavit of Carl O. Kamp, Jr. at 2.

Although the FHLBB provided for the use of supervisory goodwill through GAAP, it would only give its approval on a case by case basis. Parties who wished to execute a merger had to request permission from the FHLBB to use supervisory goodwill. Typically, a supervisory agent brought two thrifts together, they would execute an agreement to merge, and they would apply to the FHLBB for permission to consummate the merger. If the FHLBB approved of the merger, it would issue a resolution stating so under certain conditions. One of these conditions would be that the parties have their accountants prepare a proposal acceptable to the supervisory agent which certified that any goodwill resulting from the merger was in accordance with FHLBB regulations. The proposal also had to state the period over which the supervisory goodwill would be amortized. Neither the FHLBB nor the supervisory agents were required to approve of a merger, even if its proposed accounting treatment complied with the FHLBB regulations which required the use of GAAP. Consequently, FHLBB approval of the use of supervisory goodwill was more an exercise of genuine choice than a course of action mandated by its own regulations.

The FHLBB, upon consummating such a merger, explicitly stated in the resolutions

---

1. Walker was on the board of directors of a troubled thrift that plaintiff acquired. A supervisory agent from the FHLBB "informed the Board that the regulatory authorities had recently approved certain accounting procedures to encourage healthy thrifts to seek mergers with insolvent ones, subject to consent of the Federal Home Loan Bank Board...."

giving its approval that it was receiving a benefit. For example, Resolution No. 85–223, in which the FHLBB approved of plaintiff's acquisition of New Federal Savings and Loan of Knoxville, recognized that "[s]evere financial conditions exist which threaten the stability of a significant number of institutions the accounts of which [were] insured by the FSLIC" and that the "[t]he [m]erger would lessen the risk to the FSLIC." The resolution also recognized "[t]hat the Thrift Board, as operating head of the FSLIC, in making its determination under [the] Resolution has consideration to the need to minimize the cost of financial assistance...." Plaintiff's Exhibit 14.

In 1981, supervisory agents of the FHLBB canvassed many thrifts in Virginia to see if they were interested in acquiring First Federal Savings and Loan Association of New River and Peoples Federal Savings and Loan Association of Roanoke in an unassisted merger. The FHLBB felt a merger was necessary because the thrifts' operating losses were accumulating so rapidly that they would become insolvent within several months and perhaps be liquidated. Besides its concern about funding a liquidation, the FHLBB was also concerned about the impact a liquidation would have on the public's impression of the thrift industry. Plaintiff's proposal for the merger was chosen by the FHLBB because it agreed to merge without financial assistance. Defendants' Response to Plaintiff's First Set of Interrogatories at 3, 6.

Plaintiff stipulated that it would not merge with the insolvent thrifts if it could not account for supervisory goodwill as an asset. This condition, however, was obvious since the combined negative net worth of the two institutions was over $40 million and would have subjected plaintiff to sanctions for violating the capital standards of the FHLBB had it been accounted for as a liability. The supervisory agents assured plaintiff that the existing regulations permitted supervisory goodwill, and that the FHLBB would approve of an accounting proposal that used principles in accordance with GAAP and FHLBB regulations.

The FHLBB formally approved of the merger when it issued Resolution No. 84–42 on January 22, 1982. The resolution stipulated that plaintiff's accountants had to submit a proposal which "substantiate[d] the reasonableness of amounts attributed to intangible assets, including goodwill, and ... the related amortization periods and methods...." Plaintiff's Exhibit 8. On May 24, 1982, plaintiff's accountant submitted a proposal which was later approved, and which provided for the supervisory goodwill resulting from the merger to be amortized over a period of 40 years. The proposal cited standards and principles from the FHLBB to support the accounting and concluded that "the period and method of amortization of goodwill ... are within the bounds established" by standards issued by the Board in its various publications. Plaintiff's Exhibit 11.

Sometime in 1985, a representative of the Home Loan Thrift of Cincinnati asked plaintiff if it was interested in bidding for the acquisition of New Federal Savings and Loan Association of Knoxville, Tennessee. New Federal had been formed by the FSLIC on November 16, 1984 and comprised five failed savings and loan associations in which the FSLIC had taken over. Plaintiff was chosen as the merger partner with New Federal because it offered the largest premium of all bidders. In addition, "the FSLIC did note that Charter was a more viable institution with less supervisory concern than the institution bidding the next highest premium." Defendant's Answer 17 to Plaintiff's First Set of Interrogatories. Had the FSLIC liquidated New Federal, it would have required a cash transfer of $196 million. Plaintiff's bid, however, required the FLSIC to transfer only $181 million. Plaintiff told the supervisory agent from the Cincinnati office that the bid was made under the condition that $15 million would be treated by the FHLBB as supervisory goodwill to be amortized over a period which the parties would stipulate later. Affidavit of E.L. Byington, Jr. at 5.

On March 29, 1985, representatives from the FSLIC made a merger agreement with plaintiff. The agreement required both

parties to "execute and deliver all instruments, certificates, and other documents as may be necessary or incidental to the performance of [the] Agreement." Plaintiff's Exhibit 12 at 4. The FHLBB approved of the merger in Resolution No. 85–223 which it issued on March 29, 1985. Like the resolution approving the previous merger, 85–223 stipulated that plaintiff's accountants would have to submit an accounting proposal which explained the amount of good will generated by the merger and the period of amortization. Plaintiff's Exhibit 14 at 7. The accountants submitted a proposal which would amortize $15 million in good will over 35 years, and it was accepted by representatives of the Home Loan Thrift in Atlanta. The proposal cited principles and standards established by the Board to justify the accounting. Shortly after merging with New Federal, plaintiff merged with Magnolia Federal Savings and Loan Association under circumstances resembling the other two mergers. The Magnolia merger generated only $24 thousand in goodwill.

Defendants and plaintiff disagree over how to characterize the legal relationships between plaintiff and the FHLBB when the mergers were transacted. Plaintiff wants the court to imply a contract between it and the government. The government needed plaintiff to acquire the accounts of the troubled thrifts in order to avoid the costly alternative of liquidating them. Plaintiff was under no obligation to acquire them, so the government had to offer an inducement, namely a promise to allow plaintiff to use an accounting device that labeled the acquired liabilities as assets and amortize them over a period and under a method both parties agreed upon. According to plaintiff's characterization, the government needed plaintiff's services and made an offer based on a promise in order to induce plaintiff's assent to provide the services. The service of relieving the government from dealing with the troubled thrifts was the government's consideration. Plaintiff's consideration was the ability to expand its operations by converting the troubled thrifts into one of its branches. The government was not forced to allow plaintiff to merge with the troubled thrifts. It was a party to the transaction because it desired the merger and chose to induce plaintiff to act in a certain way that was a necessary prerequisite to perform the merger.

Defendants deny that the government was a party to a contract. The only contracts in the mergers were between plaintiff and the thrifts it acquired. After the parties made the agreements they asked for permission from the agency charged with regulating the industry if they could consummate the transaction. This step was a requirement that all thrifts had to follow when they transacted a merger. The FHLBB saw nothing in the transaction that violated its regulations and therefore gave its consent. The FHLBB was merely following its own regulations as they existed at the time. It was not promising to give plaintiff a contractual right to be treated as those regulations prescribed. This difference over how to characterize the legal relationship between the FHLBB and plaintiff is the most important question that underlies the merits of the parties' claims.

Congress dramatically altered the regime which regulated the thrift industry when it passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). The new law created the defendants in this case—OTS and FDIC—which replaced the FHLBB and FSLIC respectively. FIRREA established new capital standards for the thrift industry and abrogated the use of supervisory goodwill.

OTS's new regulations prescribed a variety of sanctions for noncompliance with the new standards, and FIRREA gave OTS broad authority to place a thrift in conservatorship or receivership if it operated in an "unsafe or unsound" condition. The regulations required noncomplying thrifts to submit a capital plan to OTS which explained measures the thrift would take to achieve compliance with the standards by the end of 1994. OTS announced in Thrift Bulletin 36a that any capital plan would be unacceptable if it did not anticipate full

regulatory compliance by December 31, 1994.

On March 26, 1990, OTS notified plaintiff that it was insolvent. In a letter dated January 17, 1991, OTS rejected plaintiff's capital plan and would not permit it to make any new loans or investments, but it offered to take less restrictive measures if plaintiff would sign an enclosed "consent agreement." Plaintiff's exhibits 2, 3. Among the agreement's many provisions were plaintiff's consent to the appointment of a conservator or receiver, an agreement by the board of directors of plaintiff to resign at the request of OTS, and an agreement not to sue any thrift which OTS might place into conservatorship or receivership.

After receiving the letter plaintiff received several calls from thrifts that said they were referred by OTS in order to "assist" plaintiff. Plaintiff suggests that the word "assist" refers to a program conducted by the Resolution Trust Corporation called the Accelerated Resolution Program (ARP) in which "the assisted institution [is] put into receivership immediately prior to the sale of the institution." 55 Fed.Reg. 37380–01 (1990).

Defendants argue that there was never a contract between plaintiff and the government to account for supervisory goodwill as an asset. Because, FIRREA has abrogated supervisory goodwill, all liabilities that were previously recorded as assets by plaintiff must now be recorded as liabilities. If plaintiffs can not meet these new standards they are subject to the sanctions the law prescribes for violating them. Plaintiff has no contractual entitlement to operate under the regulations of the old regime. Even if there was a contract, this court has no jurisdiction to hear plaintiff's claim because only the Claims Court has jurisdiction to hear the contract claim. In addition, defendants have not taken sufficient actions to make plaintiff's claim ripe for review. In particular, the FDIC argues that it has not communicated to plaintiff or made a formal decision concerning its status.

Plaintiff argues it made a contract with the FHLBB for the use of supervisory goodwill, and the contract was abrogated by FIRREA. Plaintiff seeks rescission of the contract because FIRREA was a supervening law that made performance impossible. The court should place the parties in the status quo ante by giving the troubled thrifts back to the government, which would relieve plaintiff of having to account for their liabilities. Plaintiff notes that the government's position would improve under this remedy because plaintiff has already amortized some of the liabilities.

In the alternative, plaintiff asks the court to characterize the abrogation of its contractual entitlement as a takings and enjoin the government from applying sanctions since it is not going to adequately compensate plaintiff. Defendants assert that only the Claims Court has jurisdiction over a takings claim, and that the issue is not ripe for review.

Plaintiff pleads another alternative form of relief that contradicts its first claim. According to this theory, a savings provision in FIRREA preserves all contracts made by the FHLBB. Since there was a contract between plaintiff and the FHLBB for treating supervisory goodwill as an asset, the statute preserves this contractual entitlement. The court should enjoin defendants from applying sanctions that they would not otherwise apply had supervisory goodwill been treated as an asset. Defendants contend the savings provision does not preserve a contract transacted by the FHLBB if its terms conflict with provisions in the statute. Since plaintiff's purported contract violates the capital standards prescribed by the statute, Congress did not intend to preserve it.

The plaintiff's last alternative argument is that OTS violated the Administrative Procedure Act (APA) because it did not give opportunity for notice and comment when it promulgated Thrift Bulletin 36a, which disallows capital plans that do not meet full regulatory compliance by December 31, 1994. Defendants response is that the regulation in question was not subject to these provisions of the APA.

**816**

This court is essentially granting plaintiff's first claim for relief by making a declaratory judgment that the parties entered into a contract which allowed plaintiff to use supervisory goodwill and amortize it within the respective periods of 35 and 40 years. Because defendants have not yet enforced sanctions against plaintiff, a declaratory judgment is more appropriate than requiring defendants to take possession of the assets and liabilities, since it is still unclear whether they will take action that will make performance of the contract impossible. As this opinion will explain later, the decision of whether FIRREA abrogated the contracts should be left to the defendants. The question of whether there was an implied contract between the FHLBB and plaintiff should be answered by this court.

## I. The District Court's Jurisdiction Over the Contract Claim

■ This court's jurisdiction over the claims against both defendants is granted by 12 U.S.C.A. §§ 1819(a) Fourth and 1464(d)(1)(A) (West Supp.1991). Section 1464(d)(1)(A) states that the director of the Office of Thrift Supervision "shall be subject to suit (other than suits on claims for money damages) ... in the United States district court for the judicial district in which the savings associations's home office is located...." Section 1819(a) Fourth states that the Federal Deposit Insurance Corporation has the power "[t]o sue and be sued and complain and defend, in any court of law or equity, State or Federal."

Defendants argue that despite these provisions, Congress has not waived sovereign immunity in district court for plaintiff's rescission claim because it is based on a contract, seeks relief which must come from the Treasury, involves injunctions against public officials, and is really a claim against the United States even though agencies are the named defendants. *Accord, Portsmouth Redevelopment & Housing Authority v. Pierce,* 706 F.2d 471, 473 (4th Cir.1983), *cert. denied* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983) ("[T]he Tucker Act establishes three conditions which, if satisfied, vest subject matter

jurisdiction exclusively in the Claims Court. The action must be against the United States, seek monetary relief in excess of $10,000, and be founded upon the Constitution, federal statute, executive regulation, or government contract."). The *Portsmouth Redevelopment* court also ruled that "an action against a federal agency or official will be treated as an action against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act.'" *Id.,* quoting *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). In *Portsmouth Redevelopment,* the money used to satisfy the plaintiff's claim would have come from an agency's appropriations and not the U.S. Treasury, however, the Fourth Circuit Court still considered it part of the "public treasury" and therefore ruled that the claim was against the United States.

Although plaintiffs have sought an injunction which would "restrain the Government from acting," this court has found it premature to issue it. This court is only issuing a declaratory judgment that the proposals submitted by plaintiff for the 1982 and 1985 mergers constituted terms of an implied contract. Any government enforcement action that makes performance impossible will rescind the contract and, as a result, will sever the merged institutions. These merged institutions will become separate entities for the purposes of such enforcement action. This judgment is not restraining the government from acting or compelling it to act or expending public funds. It merely states the legal effect of actions it may take. It is therefore questionable whether this case constitutes an "action against the sovereign."

■ Even if this case is considered an "action against the sovereign," the Court of Claims does not have exclusive jurisdiction because nothing in plaintiff's claim involves monetary relief. Plaintiff seeks an order which would place the institutions

subject to the proposals of the 1982 and 1985 merger agreements in the possession of the government. This court's judgment modifies this request by declaring there is a contract which will be rescinded if the government takes actions that make performance impossible. Defendants have noted that transferring the institutions to the government would entail a transfer of money to the government, and they vaguely suggest that the possibility of such an "exchange" places this case within the jurisdiction of the Claims Court. Defendants, however, offer no authority for this proposition, and this court sees no logical connection between it and the requirement in *Portsmouth Redevelopment* that plaintiff's claim involve monetary relief. Plaintiff's claim is purely equitable in nature and is therefore outside the jurisdiction of the Claims Court, because the Tucker Act does not give it jurisdiction to grant injunctive or declaratory relief. *Lee v. Thornton*, 420 U.S. 139, 95 S.Ct. 853, 43 L.Ed.2d 85 (1975). If this court has no jurisdiction to hear the claim, then no court does. There is no reason to believe Congress intended such a result when it created district court jurisdiction in §§ 1819 and 1464.

■ Defendants cite *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) for the proposition that, in spite of the waivers of sovereign immunity in §§ 1819 and 1464 of the agencies' enabling legislation, a suit against the agencies requesting injunctive relief is really a suit against the United States because it interferes with public administration and restrains the government from acting. Because the plaintiffs in *Dugan* were suing the United States, the Court restricted their remedies to money damages provided under the Tucker Act. Defendants' interpretation of *Dugan* implies that a waiver of sovereign immunity in an agency's enabling legislation never covers suits to enjoin the agency from acting. If a plaintiff seeks relief, he or she must wait for the agency to act and then go to Claims Court for money damages.

A closer reading of *Dugan* reveals that the Supreme Court did not intend such a sweeping ruling. The Court was not presented with a general waiver of sovereign immunity that allowed an agency to be sued. The Court addressed a specific waiver of sovereign immunity that allowed the United States to be sued in a controversy over rights to use water. The Court did not conclude that the waiver of sovereign immunity only allowed suits under the Tucker Act. Rather, the Court concluded that plaintiff's claim was not covered by the waiver of sovereign immunity and therefore could only be heard under the Tucker Act. The Court interpreted the waiver of sovereign immunity as allowing only *"general* adjudication of 'all of the rights of various owners on a given stream'" rather than "a private suit to determine water rights solely between the respondents and the United States and the local Reclamation Bureau officials." *Dugan* 372 U.S. at 618, 83 S.Ct. at 1005. The waivers of sovereign immunity in §§ 1819 and 1464 are much broader. Defendants do not offer an interpretation of these waivers that shows Congress did not intend plaintiff's claim to be covered by them. *Dugan* is not applicable in cases where there is a general waiver of sovereign immunity in the enabling legislation that creates an agency.

Not all contract claims against the government are in the exclusive jurisdiction of the Claims Court. "The Tucker Act does not impliedly forbid the issuance of a declaratory judgment stating that [a plaintiff] possesses contract rights against the United States. *Laguna Hermosa Corporation v. B.E. Martin*, 643 F.2d 1376, 1379 (9th Cir.1981). The Tucker Act grants the district court jurisdiction over contract claims for amounts under $10,000. 28 U.S.C.A. § 1346(a)(2) (West Supp.1991). Defendants speculate that plaintiff in the future may return to this court and request monetary relief that exceeds $10,000 if this court grants its claim for rescission. There is no reason to believe plaintiff will bring such a suit, and even if it did, defendants are free to argue that this court has no jurisdiction to award more than $10,000 if and when the government decides to abrogate the contract.

■ Even if plaintiff's claim had involved monetary relief, this would not be dispositive because the Fourth Circuit does not place all such claims outside district court jurisdiction. In *Ulmet v. United States*, 888 F.2d 1028 (4th Cir.1989), the court noted that its precedents concerning district court jurisdiction over claims for monetary relief had been altered by the Supreme Court in *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1987). *Ulmet*, 888 F.2d at 1030. The Supreme Court drew a distinction between monetary relief, which is incidental to "equitable action for specific relief" and "an action at law for damages...." *Bowen v. Massachusetts*, 487 U.S. at 893, 108 S.Ct. at 2731. Only actions for money damages are in the exclusive jurisdiction of the Claims Court. Equitable relief includes "the recovery of specific property or monies...." *Id.*, quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949). "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. at 893, 108 S.Ct. at 2732. Plaintiff's claim is clearly equitable in nature and not a claim for money damages in disguise. This court recognizes that *Bowen* did not apply to a claim against the government based on contract, and the Fourth Circuit has not addressed the issue of whether *Bowen* allows monetary relief over $10,000 from the government based on a contract claim. As stated earlier, it is only proper to settle this issue when it arises.

There is another reason why this court should not hesitate over the possibility of a future restitution claim. The Federal Circuit made a broad interpretation of the "sue and be sued" clause in the enabling legislation that waives sovereign immunity for the FDIC. In *Far West v. OTS*, 930 F.2d 883 (Fed.Cir.1991), the court ruled that the "FDIC's statutory authorization to sue and be sued in a state or federal court accommodates the commercial and business context in which this agency operates." *Id.*, at *888*. The court ruled that the waiver of sovereign immunity covered a contract claim seeking monetary relief. The Supreme Court has described the special circumstance surrounding a "sue and be sued" clause in the enabling legislation of a government corporation

> Such waivers by Congress of governmental immunity ... should be liberally construed.... Hence, when Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to 'sue and be sued,' it ... must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances.

*Loeffler v. Frank*, 486 U.S. 549, 554–55, 108 S.Ct. 1965, 1969, 100 L.Ed.2d 549 (1988), quoting *FHA v. Burr*, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940).

As the Federal Circuit noted, the Fourth Circuit interpreted the "sue and be sued clause" as waiving sovereign immunity from suits against the Postal Service for post-judgment interest in *White v. Bloomberg*, 501 F.2d 1379, 1386 (4th Cir.1974). When there is "no qualification upon the ... amenability to process stated in the [enabling] statute, ... the phrase 'sue and be sued' ... is to be given its normal connotation and construction as a waiver of constitutional immunity, embracing all civil legal procedures." *Gen. Elec. Credit Corp. v. Smith*, 565 F.2d 291 (4th Cir.1977).

The enabling language of § 1819(a) Fourth states that the FDIC has the power "[t]o sue and be sued and complain and defend, in any court of law or equity, State or Federal." The language "in any court of law or equity, State or Federal" is a critical phrase indicating that Congress did not intend to restrict federal jurisdiction to the Claims Court since "Congress could not have intended for suits over $10,000 to be brought in 'any state court of general jurisdiction, but in the federal jurisdiction only in the Court of Claims.'" *Fletcher v. Washington and Lee University*, 706 F.2d

475 (4th Cir.1983) quoting *Ferguson v. Union Nat'l Thrift* 126 F.2d 753, 756 (4th Cir.1942).

According to *White*, a limitation to a "sue and be sued" clause will be implied only where it is

> clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense.

*White v. Bloomberg*, 501 F.2d at 1386, quoting *FHA v. Burr* 309 U.S. at 245, 60 S.Ct. at 490. Defendants have not shown that allowing a suit for rescission will seriously interfere with the FDIC's authority to carry out the policies of FIRREA. If the government decides to place plaintiff in receivership, it might have a plausible claim against the FDIC for rescission damages under the authority of *White v. Bloomberg*. Although this court is certainly not implying that plaintiff would have a good chance of winning such suit, it will certainly not deny jurisdiction simply because plaintiff may have grounds for bringing such a claim in the future.

The plain language of §§ 1819 and 1464 grants this court jurisdiction to make a declaratory judgment on plaintiff's rescission claim, and defendants have shown no legal authority that suggests it belongs exclusively in the jurisdiction of the Claims Court.

## II. Ripeness

■ This court is not reviewing a legal challenge to the way OTS has interpreted FIRREA through its regulations, or how OTS has applied its regulations. Rather, it is reviewing whether there was an implied contract between the FHLBB and plaintiff and whether rescission is an appropriate remedy in the event that OTS enforces FIRREA in a way that makes performance impossible.

Defendants cite *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) to support their argument that this court lacks jurisdiction over plaintiff's claim against FDIC. In *O'Shea* the Court ruled that in order to bring a claim against the government in an Article III court, a plaintiff must have sustained or be in immediate " 'danger of sustaining some direct injury' as the result of the challenged statute or official conduct." *Id.*, quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). Defendants argue that since FDIC has not threatened to take action against plaintiff, there can be no immediate threat of injury. Even though FDIC has already stated that it believes plaintiff is capital deficient, defendants argue this does not present an immediate threat of injury from the FDIC because it only has "back-up" authority to take action against plaintiff if OTS fails to do so.

FIRREA provides broad authority to appoint the FDIC as a conservator or receiver. Section 212(c) of FIRREA allows the FDIC to be appointed conservator or receiver by OTS without qualification. Under § 212(c)(2)(A)(ii) only the FDIC can be appointed as receiver "whenever a receiver is appointed for the purpose of liquidation or winding up the affairs ..." of a seized thrift. Section 301(5)(d) gives OTS authority to appoint a receiver to a thrift if it operates under an "unsafe or unsound" condition. Section 301(5)(t)(6)(E) defines "unsafe or unsound" condition as failing to comply with "any plan, regulation, or order under this paragraph" which is entitled "Consequences of failing to comply with capital standards."

OTS formally declared that plaintiff was insolvent because it failed to meet the capital standards set by its regulations. It issued a long list of restrictions over plaintiff's operations which it offered to loosen if plaintiff agrees not to challenge the appointment of a conservator or receiver. Plaintiff has been contacted by thrifts that were referred by OTS in order to "assist" plaintiff, a term that most likely refers to a program conducted by the Resolution Trust Corporation (RTC) called the Accelerated

Resolution Program (ARP). Under ARP, "the assisted institution [is] put into receivership immediately prior to the sale of the institution." 55 Fed.Reg. 37380–01 (1990). Pursuant to § 501(b)(1)(C), the RTC operates under the management of the FDIC. The court believes these circumstances indicate that plaintiff is under an immediate threat of being placed into a receivership conducted under the authority of the FDIC, therefore it is not premature to join the FDIC in this suit.

Defendants urge this court to adopt the ruling by the Sixth Circuit in *First Federal Sav. v. Ryan*, 927 F.2d 1345 (6th Cir.1991) in which the court held that the claimants' challenge to the appointment of a conservator or receiver was not ripe for review because one had not yet been appointed. This court's decision is not currently addressing an injunction against appointing a receiver or conservator. It is addressing whether OTS must treat the thrifts plaintiff acquired in 1982 and 1985 as separate entities for purposes of enforcing sanctions that impose a significant burden against plaintiff for violations of OTS regulations which would not have taken place but for the supervisory acquisitions, and which would not have taken place under the pre-FIRREA regime. This court, therefore, is not addressing the legality of the appointment of a conservator or receiver. For this reason, this case is closer to *Franklin Fed. Sav. Thrift v. Director, OTS*, 927 F.2d 1332 (6th Cir.1991), the companion case of *First Federal*. In *Franklin*, the court held that an injunction against the application of Thrift Bulletin 38–2 by OTS was ripe for review. The court made a distinction between an injunction against the appointment of a conservator or receiver and an injunction against the application of a rule.

Even if *First Federal* were applicable to this case, this court disagrees with the Sixth Circuit's decision concerning preappointment challenges. The court reasoned that when two provisions of FIRREA were read together, it was clear that Congress disallowed preappointment challenges to conservators or receivers because it obviously intended that there be review only after the appointment. 12 U.S.C.A.

§ 1464(d)(2)(G) (West Supp.1991) is an anti-injunction provision: "Except as otherwise provided in this subsection, no court may take any action for or toward the removal of any conservator or receiver or … restrain or affect the exercise of powers or functions of a conservator or receiver." 12 U.S.C.A. § 1464(d)(2)(E) (West Supp.1991) provides that "[t]he director shall have exclusive power and jurisdiction to appoint a conservator or receiver.…" "[T]he association may, within 30 days thereafter, bring an action in the United States district court … for an order … to remove such conservator or receiver.…"

The court claimed that since the language of the statute gave the Director of OTS "exclusive power and jurisdiction to appoint a conservator or receiver," the "Congressional granting of authority to the Director [in § 1464(d)(2)(E) ] … would be essentially meaningless if any thrift could run to the nearest federal court and get an injunction upon the potential threat of having a conservator or receiver appointed. Congress chose to grant a particular power to an executive-branch official. Allowing this type of injunction would essentially repeal that decision." *First Federal*, 927 F.2d 1345, 1355–56. This rationale would invalidate any injunction against an official exercise of authority anytime the phrase of a statute gives "exclusive power and jurisdiction" to the official to exercise his or her authority. This court will not adopt this rule until instructed to do so by the Fourth Circuit.

The anti-injunction provision in § 1464(d)(2)(G) only refers to the "removal" of a conservator or receiver, not an attempt to block one. The plain meaning of the two provisions is that the only way to challenge the power of the receiver, once it is appointed, is to sue in district court within 30 days of its appointment. Congress was obviously conscious of when it wanted an anti-injunction provision to apply, and it only made it apply after the receiver is appointed.

Congress may have determined that once a receiver was appointed, preliminary injunctive relief would have a deleterious

effect upon a savings and loan association. After appointment, immediate, unobstructed action by the receiver may be essential to conserve the savings and loan association's assets and prevent panic. Prior to appointment, injunctive relief may prevent needless liquidation of viable savings and loan associations.

*First Fed. Sav. Thrift and Trust v. Ryan,* 927 F.2d 1332, 1360–61 (6th Cir.1991) (Contie, J., dissenting) (quoting *Century Fed. Sav. Thrift v. United States,* 745 F.Supp. 1363, 1367 (N.D.Ill.1990)).

Even if this court were to apply the statutory interpretation used by the court in *First Fed.,* it would not be applicable to the present case. In *First Fed.,* the court was not presented with a "consent agreement" in which OTS agreed to ease its restrictions, which included a ban on any new investments or loans, if the plaintiff would renounce its right to oppose the appointment of a conservator or receiver. The majority concluded that because Congress only provided a right to challenge the appointment of a conservator or receiver after the appointment, it did not intend to make a remedy available before the appointment. A premise of the majority's ruling was that Congress granted the right. It is unclear whether the court would reach the same conclusion in a case where OTS has pressured a claimant to renounce its right to challenge an appointment. Under such a ruling a claimant would be forced to submit to pressure from OTS to renounce the right to challenge the appointment as long as OTS had not yet made an appointment. OTS would have an extraordinary power to pressure claimants into giving up their rights to challenge an appointment. It is quite possible that the court would view this exercise of power as defeating the intent of Congress.

III. Contractual Issues

A. Whether There was a Contract.

■ The facts of this case are not in dispute. The merits of this case depend on how this court characterizes the facts. The court finds a serious inconsistency in defendants' interpretation of plaintiff's relations with the FHLBB which the following quotation evokes: "There is no evidence in this case—and plaintiff cites none—suggesting that the FHLBB agreed to do anything more than enforce a regulatory mandate." Defendants' Opposition to Plaintiff's Motion for Summary Judgment at 11. Defendants, on the one hand, state that the FHLBB "agreed to" do something, but on the other hand characterizes it as a "regulatory mandate." A mandate is not something one agrees to do, since it is a command. Defendants do not want to recognize that the FHLBB had the discretion to allow or disallow the use of supervisory goodwill over the stipulated time for amortization. The inducement to allow it came, not from the mandate of a regulation, but the FHLBB's need for assistance from plaintiff's institution. This was consideration, and it is one of the essential elements in the parties' legal relationship which characterizes it as contractual in nature. Had the FHLBB acted merely because it was following its own regulations, there would have been no consideration.

In addition to the existence of consideration, the parties made mutual promises. The approval by the FHLBB of the accounting proposals was an implicit promise, because plaintiff was justified "in understanding that a commitment ha[d] been made." Restatement (Second) of Contracts § 2 (1979). Plaintiff was justified in this understanding because it was obvious that the FHLBB intended to make a commitment, since it agreed that supervisory goodwill would be amortized over periods of 35 and 40 years. When a party wants to engage in conduct that is subject to an agency's regulatory authority, and the agency gives permission to engage in the conduct for a specified period, the party is justified in understanding that the agency is committed to allowing the conduct for the specified period. If the agency has received consideration for its permission, a contract is formed.

Defendants argue that "[t]here was no promise ... that regulatory capital requirements were specially altered or frozen for [plaintiff]." Defendants' Opposition to

Plaintiff's Motion for Summary Judgment at 11. The court recognizes that when the FHLBB made a commitment to allow supervisory goodwill to be amortized over periods of 35 and 40 years, it was not "specially altering" its regulations, since the commitment was permitted by the regulations. The court also recognizes that the FHLBB did not promise not to alter its regulations in the future. These issues, however, do not address the question of whether the FHLBB promised to allow plaintiff to use supervisory goodwill according to a specified amortization period. They address what the remedy should be in the event that the FHLBB does not perform according to its promise.

### B. Whether Firrea Abrogated the Contract and What the Remedy Should Be.

#### 1. Whether Firrea Abrogated the Contract.

■ Defendants argue "that in the enactment of [FIRREA], Congress and the President affected, and compelled OTS to affect, Charter's ability to include supervisory goodwill in capital." Defendants' Response 7 to Plaintiff's Request For Admissions. In its alternative pleading, plaintiff argues that FIRREA preserves, not abrogates, its contract for the use of supervisory goodwill. Plaintiff asserts that this court does not have to pay substantial deference to defendants' interpretation of the language in FIRREA because the Supreme Court has ruled that "a pure question of statutory construction [is] for the courts to decide." *Immigration and Naturalization Service v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987).

The Court, however, made it clear that this is only true when

> administrative constructions ... are contrary to clear congressional intent.... If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute.... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute....
>
> If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, it should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

*Immigration and Naturalization Service v. Cardoza–Fonseca*, 480 U.S. at 445 n. 29, 447–48, 107 S.Ct. at 1220 n. 29, 1221–22, quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Whether the court accepts defendants' interpretation of FIRREA does not depend on whether it prefers plaintiff's interpretation. It depends on whether defendants' interpretation is a plausible reading of the language and does not clearly conflict with congressional intent.

The parties agree that § 301(t) of FIRREA requires that the use of supervisory goodwill in calculating the "core capital" of a thrift must be phased out by December 31, 1994. Section 301(t) also requires that supervisory goodwill included in core capital must not be higher than certain percentages of a thrifts assets each year. The percentages decrease each year, starting from 1.5 percent for the period prior to January 1, 1992 and ending with .375 percent for the period between January 1, 1994 and December 31, 1994. The parties also agree that FIRREA requires thrifts that do not comply with the capital standards to submit a Capital Plan which explains the steps the thrift will take to achieve compliance. Plaintiff submitted a plan to OTS, which was rejected.

■ The parties' major disagreement over the interpretation of FIRREA concerns provisions of § 401. According to plaintiff, the following savings provision in § 401(g) exempts supervisory goodwill from the requirements of the new capital standards if it was created through a con-

tract with the FHLBB: "Subsection (a) [which abolishes the FLSIC and the FHLBB] shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Thrift Board, or any other person, which ... existed on the day before the date of the enactment of this Act." According to plaintiff, this provision secures its contractual right to treat supervisory goodwill according to the terms stated in the accounting proposals because such treatment was a contractual obligation of the FHLBB. According to defendants, the provision only saves contractual obligations which the act of abolishing the FHLBB would otherwise have terminated. Since the use of supervisory goodwill was terminated through the enactment of § 301 (not the abolishment of the FHLBB), the savings provision of § 401(g) does not apply. This court opines that defendants' interpretation is plausible.

This court also agrees with the Eleventh Circuit's analysis of FIRREA's legislative history which concludes that Congress did not enact a provision that preserves contracts for the use of supervisory goodwill. In *Guaranty Fin. Serv., Inc. v. Timothy Ryan,* 928 F.2d 994 (11th Cir.1991) the court analyzed attempts by members of Congress to protect supervisory goodwill. One amendment introduced by Rep. Hyde would have required an administrative hearing, subject to review by a district court, before an agency could take action against a thrift that otherwise would have complied with the new regulations but for the exclusion of supervisory goodwill from the calculation of core capital. This amendment was defeated. Rep. Quillen prepared another amendment which would have "grandfathered" supervisory goodwill accounted for in accordance with GAAP or in accordance with a written agreement with the FHLBB, but he withdrew it since the House was about to debate the Hyde amendment which addressed the same issues.

Several members of Congress believed the government was unfairly reneging on its contractual obligation to allow thrifts to amortize supervisory goodwill over the periods agreed upon by the FHLBB.

These members published statements in the legislative history objecting to what they understood to be FIRREA's abrogation of these contractual obligations. (See statements by Reps. Annunzio, Kanjorski, Flake, Hiler, Ridge, Bartlett, Dreier, McCandless, Saiki, Baker and Paxon in H.R.Rep. No. 101–54, 101st Cong., 1st Sess., pt. 1 at 496, 533 (1989), *reprinted in* 1989 U.S.Code Cong. & Admin.News 86, 292–94, 326–27, and the statement of Rep. Hyde in H.Rep. No. 101–54 101st Cong., 1st Sess., pt. 5 at 26–28, *reprinted in* 1989 U.S.Code Cong. & Admin.News at 409–11.). The court reasoned that if Congress had intended that § 401(g) would preserve agreements with the FHLBB for the use of supervisory goodwill, then the strongest supporters for such a policy would not vigorously protest its absence. These representatives believed FIRREA abrogated agreements for the use of goodwill, as did their opponents who helped defeat the Hyde amendment. (See statements by Reps. Vento, Roukema, Morrison, Neal, Carper, Schumer, Lehman, Keczka, McMillen, Hoagland, Gonzalez and Pelosi in H.R. No. 101–54 101st Cong., 1st Sess., pt. 1 at 541–45, *reprinted in* 1989 U.S.Code Cong. & Admin.News at 333–36). Section 401(g) was enacted without controversy, therefore it is not plausible that it addressed a controversial issue like the treatment of supervisory goodwill.

Although Congress did not accept the Hyde amendment, it did not enact legislation which specifically abrogated contractual obligations by the government to allow supervisory goodwill. Given the legislative history, the best argument plaintiff can make is that Congress's intent regarding the government's contractual obligation to allow the use of supervisory goodwill was ambiguous when it enacted § 401(g). Since defendants have given a plausible interpretation of the language in § 401(g), *Chevron* requires that this court accept it. This court emphasizes, however, that it is only reviewing OTS's authority to make the interpretation; it is not the court's interpretation. In the future, OTS may decide to change its interpretation or alter its regula-

tions. Section 301(t)(7) gives OTS authority to grant exemption from certain sanctions against thrifts that are not in compliance with the capital standards required by the Act in cases where supervisory goodwill is at issue. This court does not believe Congress' intent regarding the use of supervisory goodwill is so clear that the interpretation chosen by OTS is the only one possible.

### 2. Whether Rescission is the Appropriate Remedy

Contracts have "an implied condition that the promisor shall be absolved from performance if, through a supervening circumstance for which neither party is responsible, a thing, event or condition which was essential so that the performance would yield to the promisor the result which the parties intended him to receive, fails." *West Los Angeles Institute for Cancer Research v. Mayer* 366 F.2d 220, 223 (9th Cir.1966) quoting *Dorsey v. Oregon Motor Stages*, 183 Or. 494, 194 P.2d 967, 971 (1948). Performance may be excused when a supervening law makes it impossible. "Contractual performance can indeed be excused where the intervention of a government regulation or law makes performance impossible." *Cook v. El Paso Natural Gas Co.*, 560 F.2d 978, 982 (1977). The use of supervisory goodwill was obviously essential to the performance of the contract between plaintiff and the government. OTS has determined that using supervisory goodwill according to the terms of the contract is illegal.

If FIRREA has made performance of the contract illegal, rescission may be the appropriate remedy because the contract is no longer possible. "[I]mpossibility may be equated with an inability to perform as promised due to intervening events.... [D]ischarge by reason of impossibility—as well as the concomitant remedy (to the discharge) of rescission—enforces what can reasonably be inferred to be the intent of the parties at the time of contract." *United States v. General Douglas MacArthur Senior Village, Inc.*, 508 F.2d 377, 381 (2d Cir.1974). *See also* 17A Am Jur.2d *Contracts* (1991) ("The inability of a party to

perform a contract after it is made is, as a rule a ground for rescinding it.").

Whether the parties intended that rescission would be the remedy depends on whether they allocated the risk that a supervening event would make performance impossible. "Although ... unexpected events that prevent a party from performing his contractual obligations frequently do excuse performance ..., they do so only when it is reasonable to suppose that if the parties had negotiated expressly with regard to the unexpected contingency that has prevented performance they would have wanted the performing party to be excused." *Field Container Corp. v. Comm'n* 712 F.2d 250, 257 (7th Cir.1983). *See also* 17A Am.Jur.2d *Contracts* § 695 (1991). ("As a general principle, nonperformance of a contract is excused where performance is rendered impossible by the law, provided the promisor is not at fault and has not assumed the risk of performing, whether impossible or not."). The issue in this case addresses how the parties contemplated the risk of the government abrogating agreements that provided for the use of supervisory goodwill.

It is obvious that plaintiff did not believe a supervening law would make it illegal to continue operating by virtue of its acquisitions, otherwise it would never have made them. However, the fact that plaintiff encountered an unexpected and unfortunate contingency which made it impossible to retain the acquisitions does not in itself relieve it of its burden to assume its obligation of keeping the liabilities of the failed thrifts. "[Y]ou can bind yourself to perform acts over which you have no control. 'In the case of a binding promise that it shall rain tomorrow, the immediate legal effect of what the promisor does is, that he takes the risk of the event, within certain defined limits, as between himself and the promisee.'" *Field Container Corp.* 712 F.2d at 257, quoting O.W. Holmes, The Common Law 300 (1881).

Defendants argue the risk was allocated to plaintiff because it gambled on the agency retaining the authority to accept the capital standards submitted in the propos-

als. Without evidence to support this assertion, the court does not believe it. It implies that a promisee bears all the burden of the promisor's inability to perform. This court presumes that a promisor enters into a contract with the belief that, in the event she can not perform, the best she can hope for is complete rescission and restitution.

Defendants want the court to apply a double standard by which they become the privileged party. Defendants want to be able to rescind and be absolved of their obligation to treat goodwill according to the accounting plans that the FHLBB approved; but they want plaintiff to be forced to possess the liabilities of the acquired thrifts and suffer the consequences of noncompliance with OTS's new capital standards. In the absence of clear evidence to the contrary, this court does not believe the parties intended such a result when they made their agreement. When a government agency enters into an agreement with another party that calls for a specific use of its executive powers, it is presumed, unless there is evidence to the contrary, that the parties did not intend either party to assume the risk that the agency would not continue to have the authority to make such use of its powers in the foreseeable future.

Defendants argue that the following language of FHLBB Resolution 85–223, which certified the Thrift Board's approval of the merger with New Federal of Knoxville, indicates the parties' understanding that plaintiff assumed all risks that could result from any changes in the Board's regulations concerning the accounting of goodwill: "[I]n accounting for the Merger, Charter shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified or interpreted by applicable regulations of the Thrift Board and the FSLIC...." Exhibit 14 at 7. The court does not interpret this provision as allocating the risk of any future changes in the Board's regulations which might make the use of goodwill illegal. Under such a circumstance, performance of the contract would be illegal. It was quite possible that the Board could have modified its regulations without making performance of the contract illegal, and it seems more likely to this court that these were the circumstances contemplated by the parties when they agreed to the provision. The Board was reserving its right to modify its performance, not allocating the risk of losing its authority to perform.

The right to modify would exist even if the Board had not expressly stated it, because it is created by the doctrine of impossibility of performance due to a supervening law. The doctrine does not absolve a party from his or her obligation to perform simply because a new law unexpectedly makes performance more onerous. This is so even though the previously contemplated performance is now illegal and must be modified to be legally possible. There is a continuum of burden imposed by the necessity to modify which, at some point, becomes so overwhelming that a court will determine that substantial performance is no longer legal.

In the present case, it is obvious that if the defendants were to place plaintiff into receivership, performance would have been made illegal, since defendants would have deemed it illegal for plaintiff to operate the institution. It is also obvious that if the government bans all new loans and investments by plaintiff that the burden will be so onerous that the performance the parties had contemplated will be modified enough to become legally impossible. Because defendants play the role of regulator as well as contracting party, they control the decision of whether performance will be modified enough to be legally impossible. Since defendants have not yet made this decision through concrete enforcement action, it is only appropriate for this court to make the declaratory judgment that if they make performance too burdensome for plaintiff in the future, plaintiff will have the right to rescind the contract.

In *Fla. Power & Light v. Westinghouse Elec. Corp.*, 826 F.2d 239 (4th Cir.1987), the court ruled that a party to a contract who had promised to dispose of spent nuclear

fuel through a reprocessing plant was absolved of its obligation because of a supervening change in the law which the parties had not anticipated. At the time they signed the contract, it was the policy of the United States Government to stimulate the nuclear power industry by assuring that it would provide facilities to reprocess spent fuel. The court ruled that when the Government unexpectedly retracted its policy the contract was abrogated because a basic assumption in it no longer existed. Like the present case, the Government pursued a policy that was intended to foster a private industry and encourage businesses to make contracts in reliance upon the continuation of the policy. The policy in both cases was a key element that supported the purpose of the contracts. When a supervening law unexpectedly retracted that policy, the court concluded that the contract should be rescinded.

The fact that the government is both the contracting party and regulator in the present case should not distinguish it from *Florida Power*. In *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925), the Court ruled that the government

> when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.... "The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused.... In [Claims Court] the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants."

*Id.*, quoting *Jones v. United States*, 1 Ct. Cl. 383, 384 (1865). If the government has dual characters when it is a defendant in a suit for contract damages caused by "its public and general acts," there is no reason why it should not have them in a suit for rescission of a contract due to "its public and general acts."

Defendants cite *Connolly v. PBGC*, 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986) for its proposition that "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Id.*, quoting *FHA v. Darlington, Inc.*, 358 U.S. 84, 92, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958). Defendants believe this refutes plaintiff's request to rescind its contracts due to an unexpected intervening law which made their performance illegal.

In *Connolly*, the plaintiff administered a multi-employer pension trust which funded a pension plan and received contributions from employers pursuant to their respective collective bargaining agreements. Many of these agreements stipulated that the contributions negotiated under each collective bargaining agreement were an individual employers' only obligation to the pension plan. Many years after the trust was established, employers began withdrawing from the plan at a rate that threatened to leave it underfunded. Congress responded by enacting the Multi-employer Pension Plan Amendments Act of 1980 (MPPAA), which forced employers to continue making contributions to pensions plans after they had withdrawn from them. The explicit purpose of the law was to prevent pension plans from becoming underfunded due to employer withdrawal. The Supreme Court agreed that the law contradicted the collective bargaining agreements because it placed an additional, unanticipated liability on the employers who negotiated contributions to their respective pension plans. Since the MPPAA only applied to existing pension plans and did not require employers to create them, the employers would never have been subject to the statutory liability of the Act had they never agreed to contribute to the pension plans in the first place.

The plaintiff in *Connolly*, only argued a takings claim against the government. It could have claimed that the MPPAA constituted an unexpected supervening law that

abrogated collective bargaining agreements because it contradicted the provisions which stipulated the employers' obligations. It could have requested that the Court rescind the contracts and place the parties in the status quo ante when no pension plans existed. The Supreme Court rejected the plaintiff's taking claim, and this court will assume for the sake of argument that the Court would have also rejected a rescission claim by applying the same rule quoted by defendants—that those who do business in a regulated field are on notice that the law may change against their interests.

Even if the Court had been dealing with a rescission claim, *Connolly* would still not be applicable to the present case. As the Court's legislative history of the MPPAA showed, Congress was explicitly addressing the problem of employers withdrawing from their pension plans. Allowing them to rescind the contracts that gave rise to their pension plans would have blatantly thwarted the policy of the MPPAA. In the present case, this court accepts defendants' argument that Congress intended to abrogate the agreements which specified the capital standards under which plaintiff would operate. Unlike, *Connolly,* there is nothing in the record, defendants' arguments, or the legislative history of FIRREA that suggests returning the parties to the status quo ante would violate a policy of Congress.[2] As stated elsewhere in this opinion, nothing in this court's order gives plaintiff an entitlement to use goodwill according to the standards of the previous regulatory regime, restricts the government from enforcing the provisions of FIRREA concerning capital standards and the use of goodwill, or otherwise qualifies the government's ability to amend its laws which regulate the thrift industry. The

order merely requires the government to treat the savings and loan associations acquired in the 1982 and 1985 mergers as separate entities for the purposes of enforcing new regulations that make plaintiff's contracts with the FHLBB illegal and would not be applicable but for the use of supervisory goodwill permitted by those contracts.

## CONCLUSION

For reasons set forth above, the court grants the following declaratory relief to the plaintiff:

(1) That plaintiff entered into a contract for the use of supervisory goodwill, and any enforcement action by OTS or FDIC that substantially burdens plaintiff's operations, and which would not be taken by OTS or FDIC but for the use of supervisory goodwill according to the terms of the contract, will rescind the contract and return the institutions to their status quo ante for the purpose of such enforcement action. After the contract is rescinded, OTS and FDIC shall treat the savings associations that were merged with the plaintiff in 1982 and 1985 as separate entities for the purposes of such enforcement action.

(2) It is inappropriate to determine at this stage what kind of enforcement action will "substantially burden" the plaintiff's operations because such a determination should be made only after a hearing. The court rules, however, that conservatorship or receivership, or a ban on all loans and investments imposes a substantial burden.

(3) This case will remain open on the court's docket in order to give defendants the opportunity to decide what kind of enforcement action they want to pursue, and to give the plaintiff the opportunity to re-

---

**2.** The same reasoning also makes *Bowen v. Public Agencies Opposed to Social Security entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (POSSE) inapplicable to the present case. The controversy in POSSE arose after Congress passed an amendment to the Social Security Act which authorized states to execute agreements with the Secretary of Health and Human Services that would provide social security coverage for their employees. The amendment specifically allowed the states to terminate these agreements, and twenty years after the amendment was passed states, began doing so at a rate which alarmed members of Congress. In response, Congress rescinded the provision allowing states to terminate their agreements. The Court rejected the plaintiffs' claim that the agreements were unconstitutionally abrogated. As was the case in *Connolly,* the Congressional policy which gave rise to the controversy would have been thwarted had the Court allowed the plaintiffs to rescind their agreements.

quest a hearing in which the court will decide whether such enforcement action rescinds the contract pursuant to paragraph (1).

(4) As a result, the Temporary Restraining Order filed August 2, 1991 is moot, and hereby rescinded. There is no need for the preliminary injunction hearing scheduled for August 12, 1991.