**CHARTER FEDERAL SAVINGS BANK, Plaintiff–Appellee,**

v.

**OFFICE OF THRIFT SUPERVISION, Director, in his own official capacity and as successor in interest of Federal Home Loan Bank Board; Federal Deposit Insurance Corporation, in its own capacity and as successor in interest to Federal Savings and Loan Insurance Corporation, Defendants–Appellants. (Two Cases).**

Nos. 91–2647, 91–2708.

United States Court of Appeals, Fourth Circuit.

Argued March 2, 1992.

Decided Sept. 25, 1992.

As Amended Nov. 2, 1992.

Aaron Baer Kahn, Asst. Chief Counsel, Office of Thrift Supervision, Washington, D.C., argued (Harris Weinstein, Chief Counsel, Thomas J. Segal, Associate Chief Counsel, David H. Enzel, Sr. Trial Atty., Laurie Romanowich, Office of Thrift Supervision, on the brief), for defendant-appellant OTS.

Jacob Matthew Lewis, Civ. Div., U.S. Dept. of Justice, Washington, D.C., argued (Stuart M. Gerson, Asst. Atty. Gen., Douglas Letter, Civ. Div., U.S. Dept. of Justice, Washington, D.C., E. Montgomery Tucker, U.S. Atty., Roanoke, Va., Thomas A. Schulz, Asst. Gen. Counsel, Loretta R. Pitt, Sr. Counsel, Colleen Bombardier, Sr. Counsel, Thomas L. Holzman, F.D.I.C., Washington, D.C., on the brief), for defendant-appellant F.D.I.C.

Thomas Matthews Buchanan, Winston & Strawn, Washington, D.C., argued (Eric W. Bloom, Winston & Strawn, on the brief), for plaintiff-appellee.

Before RUSSELL, Circuit Judge, BUTZNER, Senior Circuit Judge, and SIMONS, Senior United States District Judge for the District of South Carolina, sitting by designation.

## OPINION

DONALD RUSSELL, Circuit Judge:

The Office of Thrift Supervision (OTS) and the Federal Deposit Insurance Corporation (FDIC), defendants in the action below, appeal on jurisdictional and substantive grounds the district court's declaratory judgment in this case. At issue here is whether enforcement of the strict capital requirements of the recently enacted Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified in various sections of 12 U.S.C.), abrogates prior agreements permitting use of supervisory goodwill as capital. The district court ruled that the Federal Home Loan Bank Board (FHLBB), predecessor of OTS, had contracted with Charter Federal Savings Bank (Charter) to permit Charter to treat supervisory goodwill as an asset for statutory capital reporting requirements in return for Charter's acquisition of certain failing thrifts. Subsequent to entering into the contracts, Congress enacted FIRREA, which severely restricted use of supervisory goodwill as capital. The court decided that if OTS were to enforce FIRREA's more restrictive capital requirements and if its enforcement substantially burdened Charter's operations, Charter could rescind the contracts and, consequently, rescind its acquisitions of failing thrifts.

We affirm the district court's jurisdiction to decide this case, except as to the FDIC as a party. We conclude that the claims as against the FDIC are not ripe for review and, therefore, dismiss it as a party. We reverse the district court's decision on the merits and hold that the FHLBB did not contractually obligate itself (or its successor agencies) to permit Charter to use supervisory goodwill to meet capital requirements in the face of contrary new regulations. Therefore, OTS may enforce FIRREA's supervisory goodwill requirements against Charter without consequence.

### I.

Around 1980, in response to the large number of financially troubled savings and loan institutions, the FHLBB began encouraging healthy financial institutions to acquire financially troubled thrifts. *See Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 601–03

(D.C.Cir.1992) (detailing history of 1980 savings and loan industry crisis). As a cost-saving alternative to previously offered cash incentives, the FHLBB, within its authorized discretion, offered to permit acquiring institutions to treat the negative net worth of the acquired thrift as an intangible asset, called supervisory goodwill. Supervisory goodwill could then be amortized against income over a period of time up to forty years. Treating supervisory goodwill as an asset enabled acquiring institutions, which would have had negative actual net worth after taking on a troubled thrift, to meet regulatory capital requirements for a number of years until they could absorb the negative net worth of the acquired thrift. H.R.Rep. No. 54(V), 101st Cong., 1st Sess. 26–27, *reprinted in* 1989 U.S.C.C.A.N. 86, 409–10.

In June 1981, agents of the Atlanta Federal Home Loan Bank (FHLB) contacted Charter in an effort to persuade Charter to acquire First Federal Savings & Loan Association of New River Valley (New River). New River had a deficit net worth of $13.5 million. Charter initially declined to pursue the merger because it considered the merger financially imprudent.[1] Several months later, supervisory agents again contacted Charter. This time they encouraged Charter to acquire both New River and Peoples Federal Savings and Loan Association (Peoples). Through negotiations, the FHLB agents assured Charter that it could treat the combined negative net worth of these two thrifts ($47.1 million) as supervisory goodwill and amortize it over forty years. Charter then agreed, but only after receiving permission to use the purchase method of accounting[2] and thereunder treat supervisory goodwill as an intangible asset.

Charter signed a merger agreement with the two acquired institutions dated December 8, 1981. The FHLBB subsequently approved the merger through a written resolution, subject to several conditions. One of those conditions was:

> That [Charter] shall furnish analyses, accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision, which (a) specifically describe, as of the effective date of the merger, any intangible assets, including goodwill, or discount on assets arising from the merger to be recorded on [Charter's] books and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods[.]

(J.A. at 53.) In response, Charter's independent accountant, A.M. Pullen & Co., submitted a letter detailing Charter's method of accounting for the merger. The letter described Charter's treatment of negative net worth as follows:

> (9) The difference between the fair values ... of New River's and Peoples' assets less liabilities were recorded as intangible assets and goodwill.

> In evaluating the factors prescribed by generally accepted accounting principles and the guidelines described in FHLB Memorandum R–31(b), goodwill will be amortized over forty years. The straight-line method of amortization will be used.

(J.A. at 61.) The FHLBB accepted Charter's treatment of the acquired negative net worth as supervisory goodwill and formally approved the merger. Charter has since treated the supervisory goodwill as an asset for regulatory capital requirements, offsetting an amortized amount

---

**1.** At that time, Charter had a positive net worth of only $7.69 million. Thus, it could not have fully absorbed the $13.5 million negative net worth of New River.

**2.** Under the purchase method of accounting, assets are valued at fair market value on the date of sale. For example, a $100,000 mortgage loan with a fixed 9% interest rate would be valued at a discount if current interest rates were higher than 9%, or at a premium if current interest rates were lower. A resulting positive net worth would be capitalized as goodwill and depreciated; a resulting negative net worth would be treated as an asset (supervisory goodwill) and amortized against income.

each year from income without objection from the FHLBB.[3]

In early 1985, the FHLB again approached Charter about acquiring a failing thrift, New Federal Savings and Loan (New Federal).[4] Charter agreed, conditioned upon obtaining the same terms as governed the 1982 acquisition. That is, Charter conditioned acquisition on *inter alia* permission to treat supervisory goodwill as an asset for purposes of capital regulatory requirements. At the time of the acquisition, New Federal had negative net worth of approximately $15 million.

As in the previous transaction, Charter signed a merger agreement with New Federal and received subsequent approval of the merger by resolution of the FHLBB. Charter's independent accountants again submitted a letter to the FHLBB describing the method of accounting for the merger and specifically outlining treatment of supervisory goodwill as an asset to be amortized over fifteen years. The FHLBB issued a forbearance letter to Charter stating that the FHLBB would not enforce any net worth requirements for a period of five years (until 1990), provided that deficiencies in those requirements were due to the acquisition of New Federal.

Later that year, the FHLBB approached Charter about acquiring yet another thrift, Magnolia Federal Savings and Loan Association (Magnolia). Magnolia had nominal negative net worth of approximately $24,-000. The acquisition was consummated in June 1985, on substantially the same terms as the prior acquisitions. Charter treated the $24,000 as supervisory goodwill, amor-

tized over fifteen years, which it listed as an asset on its subsequent monthly reports to the FHLBB.

Congress enacted FIRREA in August 1989, seven years after Charter's first acquisition. One purpose of FIRREA was to restore public confidence in the savings and loan industry by strengthening the soundness of individual institutions. Pub.L. No. 101–73, § 101(2), 103 Stat. at 187; H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 307, *reprinted in* 1989 U.S.C.C.A.N. 86, 103. Congress, therefore, imposed uniformly applicable, strict capital requirements on all savings associations. Section 301(t) of FIRREA mandated that the OTS promulgate regulations no later than ninety days after August 9, 1989, requiring savings and loan institutions to (1) maintain "core capital" as defined in the statute in an amount not less than 3 percent of the institution's assets; a specified, limited amount of supervisory goodwill can be used in calculating core capital; (2) maintain "tangible capital" in an amount not less than 1.5 percent of the institution's assets, which cannot include supervisory goodwill; and (3) maintain "risk-based capital" in an amount not materially less than that required for national banks. 12 U.S.C. § 1464(t) (Supp. II 1990). The resulting OTS regulations permit savings institutions to include only minimal amounts of supervisory goodwill to meet core capital and risk-based capital requirements, subject, however, to a five-year total phase-out schedule set forth in § 301(t)(3)(A), 12 U.S.C. § 1464(t)(3)(A).[5] 12 C.F.R. §§ 567.5(a), .6 (1992).

---

**3.** When Charter converted from a mutual to a federal stock savings and loan association in 1984, it informed prospective investors of the accounting arrangement. As part of the conversion arrangements with the government, Charter reduced the amortization period from 40 years to 25 years.

**4.** New Federal was actually a combination of five failed thrifts located in Tennessee, packaged

as one institution by the FSLIC and managed by an FSLIC-appointed receiver.

**5.** Section 301(t)(3)(A) provides:

The amount of qualifying supervisory goodwill that may be included may not exceed the applicable percentage of total assets set forth in the following table:

| For the following period: | The applicable percentage is: |
|---|---|
| Prior to January 1, 1992 | 1.500 percent |
| January 1, 1992–December 31, 1992 | 1.000 percent |
| January 1, 1993–December 31, 1993 | 0.750 percent |
| January 1, 1994–December 31, 1994 | 0.375 percent |
| Thereafter | 0 percent |

An institution that fails to meet FIRREA's new capital standards must submit a plan to the OTS "describ[ing] the manner in which the savings association will increase its capital so as to achieve compliance with capital standards." 26 U.S.C. § 1464(t)(6)(A)(ii)(II). Since Charter did not meet the new requirements,[6] it submitted a capital plan on January 5, 1990, with revisions submitted March 30 and November 8 of that year. The OTS disapproved Charter's plan because it did "not adequately address the institution's need for capital" and it was based on "optimistic operating projections." (J.A. at 17.) The OTS also refused to grant Charter a discretionary exemption pursuant to § 1464(t)(7). Consequently, the OTS imposed statutorily mandated restrictions prohibiting Charter from making any new loans or investments except with the prior written approval of the OTS.[7] In addition, OTS requested that Charter sign within fifteen days a Consent Agreement authorizing the appointment of a conservator or receiver to negotiate a plan of merger or reorganization on behalf of Charter. *See* § 1464(d)(2)(B) (authorizing OTS to appoint a conservator or receiver where board of directors consents). Charter refused to sign the Consent Agreement.

Charter then brought an action in the district court for declaratory judgment and injunctive relief against OTS and the Federal Deposit Insurance Corporation (FDIC). The complaint alleged that Charter and the federal agencies (or their predecessors) entered into binding contracts in the course of the 1982 and 1985 acquisitions, in which the FHLBB had promised Charter continued use of supervisory goodwill to meet capital regulatory requirements for specified amortization periods. Based on this allegation, Charter sought several alternative declarations from the court, *inter alia:* (1) that § 401(g) of FIRREA, which pre-

serves the obligations of the FHLBB incurred prior to enactment of FIRREA, obligates the OTS to abide by prior contractual promises to Charter regarding supervisory goodwill; or (2) in the event that FIRREA mandates enforcement of its capital requirements without exception, that FIRREA constitutes an intervening act which frustrates the purpose of the contracts, permitting rescission; or (3) that abandoning contractual promises constitutes a taking. The OTS countered that a contract never existed between the parties. Moreover, the OTS challenged the district court's jurisdiction to decide Charter's claims. It argued that the Tucker Act vested exclusive jurisdiction over contract actions in the Claims Court. The OTS also argued that the claims against the FDIC were not ripe for review because the FDIC had not threatened action against Charter and Charter had no other basis on which to assert an immediate threat of injury from the FDIC.

The district court asserted jurisdiction over the OTS and the FDIC pursuant to 12 U.S.C. § 1464(d)(1)(A), which grants federal courts jurisdiction over suits against the OTS, and § 1819(a), which grants federal courts jurisdiction over suits against the FDIC. It dismissed the ripeness challenge by the FDIC, finding that Charter was under an immediate threat of being placed into receivership under the FDIC. The court then ruled that the parties had entered into contractual relationships wherein Charter agreed to take over several failing thrifts in exchange for promises by the FHLBB to permit Charter to use supervisory goodwill as a capital asset over the specified amortization periods. The court accepted OTS's interpretation of FIRREA § 301, holding that FIRREA's new capital requirements abrogated prior supervisory goodwill agreements with the FHLBB. It also accepted OTS's interpretation that

---

6. With supervisory goodwill excluded, Charter had a negative net worth of approximately $19 million.

7. Under FIRREA, the OTS must restrict the asset growth of noncomplying institutions. 12

U.S.C. § 1464(t)(6)(B)(i). FIRREA also requires the OTS to issue capital directives to noncomplying institutions, which may include dividend and compensation restrictions. § 1464(t)(B)(ii).

§ 401(g) did not save the agreements and that no other nondiscretionary saving exceptions existed in FIRREA. Because of the conflict these findings produced, the court declared that if the OTS were to enforce FIRREA's new capital requirements against Charter and not grant it a discretionary exemption under § 1464(t)(7), the 1982 and 1985 contracts would be rescinded and the acquired thrifts severed from Charter. The OTS would then have to treat the acquired thrifts as separate entities for purposes of capital requirements. *Charter Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 773 F.Supp. 809 (W.D.Va.1991).

The OTS and FDIC appeal the district court's judgment. They contend on appeal that the district court did not have jurisdiction to decide these claims, that the court erroneously ruled that a contract existed between Charter and the FHLBB, and that, assuming an implied contract, the court erred in declaring a remedy of rescission.

## II.

■ We turn first to the jurisdictional issues. Appellants raise three jurisdictional challenges: (1) Charter's claims against the FDIC are not ripe for a declaratory judgment; (2) Charter's claims are reviewable only by the Claims Court under the Tucker Act; and (3) the district court did not have jurisdiction to issue a de facto injunction. Jurisdictional questions are questions of law properly reviewed *de novo*. In regard to Appellants' first challenge, we recognize that varying standards of review have been applied by Circuit Courts in reviewing district courts' exercises of jurisdiction *vel non* in declaratory judgment actions.[8] The decision whether to exercise jurisdiction in a declaratory judgment case is within the sound discretion of the district court. 28 U.S.C. § 2201

(1988). We have chosen to follow those Circuits which review such decisions *de novo*. *Mitcheson v. Harris*, 955 F.2d 235, 237 (4th Cir.1992). That is, we substitute our discretion for that of the district court's in determining whether to entertain a declaratory judgment action.

■ A. Appellants contend that the FDIC should have been dismissed as a party to this case because it had taken no action nor threatened any action against Charter. Federal courts may issue declaratory judgments only in cases of actual controversy. 28 U.S.C. § 2201 (1988). The controversy must be "ripe" for judicial resolution, that is, in the context of an administrative case, there must be "an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties." *Pacific Gas & Elec. v. Energy Resources Comm'n*, 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) (citing *Abbott Lab. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). *Abbott* set forth the two-prong test now used by courts for determining ripeness: (1) whether the issues are fit for judicial decision and (2) whether hardship will fall to the petitioning party on withholding court consideration. 387 U.S. at 149, 87 S.Ct. at 1515. Although there is no precise list of factors a court should entertain in applying this test, the Court in *Abbott* listed several for consideration. A case is fit for judicial decision where the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings. *Id.* at 149, 87 S.Ct. at 1515. The hardship prong is mea-

---

8. *Compare Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330, 1333 (11th Cir.1989) (adopting *de novo* standard of review), and *Fireman's Fund Ins. Co. v. Ignacio*, 860 F.2d 353, 354 (9th Cir.1988) (same), and *Tempco Elec. Heater Corp. v. Omega Eng'g*, 819 F.2d 746, 748 (7th Cir.1987) (same), and *Beacon Constr. Co. v. Matco Elec. Co.*, 521 F.2d 392, 397 (2d Cir.1975) (same), *with El Dia, Inc. v. Colon*, 963 F.2d 488, 492 (1st Cir.1992) (using a standard in between abuse of discretion and *de novo* review), and *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 601 n. 2 (5th Cir.1983) (suggesting abuse of discretion standard), and *Exxon Corp. v. Federal Trade Comm'n*, 588 F.2d 895, 900 (3d Cir.1978) (adopting "closer scrutiny" than abuse of discretion, but still deferential).

sured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law. *Id.* at 153, 87 S.Ct. at 1517.

Applying the *Abbott* test in this case, we believe the tentative nature of the FDIC's involvement renders Charter's claims not ripe as to the FDIC. The FDIC has two possible avenues of involvement here. First, it could be appointed by the OTS as conservator or receiver for Charter. *See* 12 U.S.C. § 1821(c) (Supp. II 1990). However, since the OTS has not yet appointed the FDIC, the only party against whom Charter's claim lies is the OTS. The FDIC has no authority to appoint itself as receiver or conservator. Second, the FDIC has authority to terminate Charter's status as an insured depository. *See* 12 U.S.C. § 1818(a)(2). Yet, before terminating Charter's status, the FDIC must first determine that Charter is "in an unsafe or unsound condition [and should not] continue operations as an insured institution." § 1818(a)(2)(A)(ii). It must then give notice for the purpose of correcting the offending practices, § 1818(a)(2)(A), and if a satisfactory change is not made, give a second notice stating its intent to terminate insurance. § 1818(a)(2)(B). Finally, the FDIC must conduct a hearing before its Board of Directors, subject to judicial review. § 1818(a)(3), (5). Thus, several contingencies separate Charter from a threat of final agency action in this case. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2757, at 586–87 (3d ed. 1983) (suggesting that cases posing a double contingency may not be appropriate for declaratory judgment). Although we realize that "final agency action" in this context does not mean that all administrative procedures must have been satisfied, *see Frozen Food Express v. United States*, 351 U.S. 40, 44–45, 76 S.Ct. 569, 571–72, 100 L.Ed. 910 (1956), it does mean that a definitive decision or ruling must have been made with regard to petitioner. Here, the FDIC has not determined Charter to be in an "unsafe or unsound condition," not issued a first notice to correct operating practices, nor

indicated any other action which would cause Charter to change its operating practices.

In *Pacific Gas & Elec.*, the Supreme Court declared not ripe for review a constitutional challenge to a California energy statute. In so holding, the Court reasoned that because "determinations under § 25524.1(b) [are made] on a case by case basis," and because "'we cannot know whether the Energy Commission will ever find a nuclear plant's storage capacity to be inadequate,' judicial consideration of this provision should await further developments." 461 U.S. at 203, 103 S.Ct. at 1721–22 (citation omitted). Like the Court in *Pacific Gas,* we find Charter's claims against the FDIC premature. We find further support for our decision in *Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991). In that case, Franklin Federal sought to enjoin the OTS and the FDIC from enforcing FIRREA's capital requirements excluding supervisory goodwill. The court held that while the suit was ripe as to the OTS, the claim as to the FDIC was not ripe because the FDIC had taken no action against Franklin Federal. *Id.* at 1338.

■ B. Appellants next argue that jurisdiction in this case lies exclusively in the Claims Court under the Tucker Act. They contend that the only waiver of sovereign immunity applicable to this action is in the Tucker Act, which grants jurisdiction to the Claims Court over all contract claims against the United States. *See* 28 U.S.C. § 1491(a)(1) (1988). Section 1346(a)(2) provides the one exception and grants concurrent jurisdiction to district courts over Claims Court actions where claims do not exceed $10,000. 28 U.S.C. § 1346(a)(2). Appellants contend that, "[a]lthough Charter does not place a dollar value on its claim, given the amounts of money involved, it appears that, if properly framed, it would exceed $10,000." Joint Brief for Appellants at 22.

We easily dispose of this claim because Charter seeks a declaratory judgment con-

cerning its contractual rights and not money damages pursuant to a contract. The Tucker Act does not forbid a district court from issuing a declaratory judgment with respect to contractual rights, even if that judgment later serves as a basis for money damages. *Laguna Hermosa Corp. v. Martin*, 643 F.2d 1376, 1379 (9th Cir.1981). Congress granted the district courts jurisdiction over suits brought against the OTS under FIRREA, "other than suits on claims for money damages." 12 U.S.C. § 1464(d)(1)(A).[9] Since Charter clearly seeks a declaratory judgment and not money damages, we find that its claims were properly before the district court.

C. The government characterizes the district court's declaratory judgment as a de facto injunction enjoining the OTS from enforcing its regulations.[10] As such, they assert, it would violate 12 U.S.C. § 1818(i), which prohibits district courts from issuing injunctions against the United States to enforce banking regulations. Since we reverse the district court's declaratory judgment, we dismiss this claim without deciding whether the district court order was in fact an injunction.

### III.

■ We now consider the substantive issues in this case. Our review is limited to whether a contract existed between Charter and FHLBB (or its replacement agency, OTS); and, if so, whether the contract provided that Charter could treat supervisory goodwill as capital during the entire specified amortization period. If we find that such a contract exists, we must then determine whether rescission is appropriate.

We do not render an interpretation of the FIRREA provisions involved here. The district court accepted the position of OTS, which Charter appears to concede on appeal, that FIRREA's strict capital require-

ments abrogate any prior agreements with the FHLBB permitting long-term use of supervisory goodwill as capital. *See* Thrift Bulletin 38–2 (Jan. 9, 1990) (stating OTS's interpretation of FIRREA § 301). The OTS also takes the position, which the district court accepted, that FIRREA contains no exceptions to its capital requirements for prior supervisory goodwill agreements. This interpretation has been adopted by all the Circuits ruling on the issue. As of this writing, six Circuits have decided similar cases involving supervisory goodwill. All found that the plain language of § 301, as well as the legislative history of FIRREA, justify the OTS's position that FIRREA's new requirements supersede prior supervisory goodwill agreements without exception. *See Security Sav. and Loan Ass'n v. Director, Office of Thrift Supervision*, 960 F.2d 1318, 1323 (5th Cir.1992); *Carteret Sav. Bank v. Office of Thrift Supervision*, 963 F.2d 567, 581–82 (3d Cir.1992); *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 615 (D.C.Cir.1992); *Far West Fed. Bank v. Director, Office of Thrift Supervision*, 951 F.2d 1093, 1099 (9th Cir.1991); *Guaranty Fin. Services, Inc. v. Ryan*, 928 F.2d 994, 1003–04 (11th Cir.1991); *Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332, 1341 (6th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991). We likewise accept this interpretation. Therefore, if we determine that the FHLBB contracted with Charter to permit use of supervisory goodwill as an asset over the specified amortization periods regardless of intervening legislation, then FIRREA's new requirements would render performance of those contracts by OTS impossible.

A. We note initially that no express, written contract exists between the par-

---

9. Section 1464(d)(1)(A) provides in part:
   [T]he Director [of OTS] shall be subject to suit (other than suits on claims for money damages) by any Federal savings association or director or officer thereof with respect to any matter under this section or any other applicable law, or regulation thereunder, in the United States district court. . . .

10. They assert that separation of the merged financial institutions is next to impossible, thus rendering the district court's option of rescinding the 1982 and 1985 contracts and enforcing OTS regulations against the individual institutions a null choice.

ties.[11] The written merger agreements were between Charter and the acquired institutions. The resolutions issued by the FHLBB in connection with the mergers merely granted that agency's approval of the merger and the accounting practices employed by Charter in connection therewith. In this regard, we find our case differs from similar supervisory goodwill cases, which have all involved written agreements between the complaining thrift and the FHLBB or FSLIC. For example, in one of the first supervisory goodwill cases decided by the appellate courts, the Eleventh Circuit assumed the existence of a contract between the plaintiff financial institution and the FHLBB where the parties had entered into a written agreement stating, " 'This Agreement shall be deemed a contract made under and governed by Federal law.' " *Guaranty Fin. Services, Inc.*, 928 F.2d at 998; *see also Security Sav. and Loan Ass'n*, 960 F.2d at 1323 (leaving issue of whether contract existed to Court of Claims—the thrift and FSLIC had executed an Assistance Agreement setting forth terms of merger); *Carteret Sav. Bank*, 963 F.2d at 574 (assuming arguendo that forbearance letter from FHLBB constituted a contract); *Transohio Sav. Bank*, at 617–18 (finding existence of contract where written Assistance Agreement existed between bank and FSLIC and the Agreement incorporated FHLBB resolution); *Far West Fed. Bank*, 951 F.2d at 1100 (leaving issue of contractual rights to Court of Claims—FHLBB issued forbearance letter and bank and FHLBB entered into written "conversion agreement"). Unlike these cases, however, we find no evidence of an express contract in the merger documents in this case.[12]

Since our case involves no written expressions of intent to contract nor any written contracts between the parties, we are reluctant to rule that a contract exists. However, we need not decide the contract issue because we find, in any event, that the FHLBB did not promise to exempt Charter from future capital regulations. We can assume, then, without deciding, the existence of an implied contract between the FHLBB (or OTS) and Charter and resolve the case on the issue of contract interpretation.

B. Charter contends that the FHLBB promised Charter permission to use supervisory goodwill as capital for regulatory purposes over the entire specified amortization periods, regardless of intervening regulations. Charter argues that it would never have agreed to take on the failing thrifts without such an assurance.

Where the federal government is a party to a contract, courts should apply an additional, special rule of contract construction. As stated by the Supreme Court:

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights, see *Perry v. United States*, 294 U.S. 330, 350–354, 55 S.Ct. 432, 434–37, 79 L.Ed. 912 (1935); *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21

---

**11.** The FHLBB expressly agreed in connection with the New Federal acquisition to forbear for a period of five years (until 1990) from enforcing net worth requirements which Charter might fail to meet due to its acquisition of New Federal. *See* Letter from FHLBB to Charter (April 2, 1985) (copy in J.A. at 127). While this may constitute an express agreement, its terms have expired and it is now moot for purposes of this case.

**12.** We also distinguish on these facts our case from two recent supervisory goodwill cases de-

cided by the Claims Court. Unlike the Circuit Courts, the Claims Court has directly ruled on the issue of whether contracts exist in supervisory goodwill cases. *See Statesman Sav. Holding Corp. v. United States*, 26 Cl.Ct. 904 (1992) (finding written Assistance Agreements between thrifts and FSLIC constituted contract); *Winstar Corp. v. United States*, 21 Cl.Ct. 112, 116–17 (1990) (*Winstar I*) (finding forebearance letter and other circumstances of transaction supported existence of a contract).

(1982). Rather, we have emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Ibid.* Therefore, contractual arrangements, including those to which a sovereign itself is party, "remain subject to subsequent legislation" by the sovereign. *Id.*, at 147, 102 S.Ct. at 907.

*Bowen v. Public Agencies Opposed to Social Sec. Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 2396, 91 L.Ed.2d 35 (1986). In *Bowen,* the Court held that a termination clause in a contract between the Secretary of Health and Human Services and the State of California was superseded when Congress amended the Social Security Act to prohibit states from terminating such contracts. The Court reasoned that since the agreement by its express terms was entered into "in conformity with" the Social Security Act, without expressly protecting California from future legislation, Congress had reserved not only the right to amend the Act, but also the right to amend the individual contracts under the Act. *Id.* at 53, 106 S.Ct. at 2397. Furthermore, the Court was reluctant to "surrender a sovereign power ... that serves to implement a comprehensive social welfare program affecting millions of individuals throughout our Nation." *Id.* at 53, 106 S.Ct. at 2397.

In the context of supervisory goodwill cases, the D.C. and Eleventh Circuits, relying on *Bowen,* have "interpret[ed] the contract provisions at issue to mean that the agencies would allow [the thrift] to treat supervisory goodwill as regulatory capital only as long as the regulatory regime permitted the agencies to do so." *Transohio,* at 620; *accord Guaranty,* 928 F.2d at 1001. In each case, the court reasoned that since the thrift had not secured in "unmistakable" terms an irrevocable promise to treat supervisory goodwill as capital, the court would not infer such a provision. *Transohio,* at 620–21; *Guaranty,* 928 F.2d at 1001. We follow these cases and hold that the FHLBB did not promise Charter continued use of supervisory goodwill as regulatory capital in the face of a contrary regulatory scheme.

In our case, like *Transohio* and *Guaranty,* the FHLBB never expressly waived its right to enforce future regulations governing supervisory goodwill. The FHLBB approved Charter's use of supervisory goodwill under its then statutory discretion to permit such accounting practices, but made no explicit promise to Charter of continued approval throughout the life of the amortization period. In other words, the FHLBB assured Charter that its use of supervisory goodwill was permissible under the then current law and that the FHLBB would approve such practices under such law. Without a more explicit promise, we will not enlarge the scope of guarantees given to Charter.

Furthermore, the highly regulated nature of the savings and loan industry convinces us that, absent an explicit statement to the contrary, the FHLBB would not have intended to promise Charter continued treatment of supervisory goodwill as capital for the life of the amortization period. The savings and loan industry has been closely regulated by the government since the early 1930's with the creation of the FHLBB and the FSLIC. Regulations govern " ' "the powers and operations of every Federal savings and loan association from its cradle to its corporate grave." ' " *Transohio,* at 601 (citing *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 145, 102 S.Ct. 3014, 3018, 73 L.Ed.2d 664 (1982) (citation omitted)). Capital requirements have been an evolving part of the regulatory scheme since its inception. *Id.* Given this environment, the FHLBB would have expected changes in statutory requirements, including capital requirements. We find it doubtful, then, that the FHLBB intended to secure to Charter the use of supervisory goodwill over a fifteen to twenty-five year period.

Charter contends that it is absurd to believe a healthy thrift would merge with a troubled one without assurances that the surviving institution could treat supervisory goodwill as regulatory capital over the

lifetime of the amortization period. However, we presume that Charter could have accounted for the risk of regulatory change in making its decisions to acquire failing thrifts. At the time of its first acquisition, Charter operated as a savings and loan. It certainly was cognizant of the regulatory intrusions into this business. If Charter wanted to avoid the risk of regulatory change, it could have demanded more explicit assurances. " 'Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.' " *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986) (citing *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958)).

C. Given our holding, we need not rule on the appropriateness of rescission as a remedy.

## IV.

In summary, we find that this case does not present any ripe controversy as to the FDIC, and we dismiss that party as a defendant. The district court did have jurisdiction over this case as to the OTS pursuant to § 301(d)(1)(A) of FIRREA. In considering the merits of Charter's case, we find that the FHLBB did not contract to exempt Charter from FIRREA's capital regulatory requirements. Rather, it agreed only to permit such use of supervisory goodwill as was lawful under the regulations. Accordingly, we reverse the district court's declaratory judgment ordering recision as a remedy for enforcement by OTS of FIRREA's new regulatory requirements.

AFFIRMED IN PART AND REVERSED IN PART.