**CHARTER FEDERAL SAVINGS BANK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–513C.

United States Court of Federal Claims.

Oct. 9, 2002.

Thomas M. Buchanan, Washington, D.C., for plaintiff.

Kenneth M. Dintzer, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., with whom were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, for defendant.

### Opinion and Order

SYPOLT, Judge.

Before the court are "short form" cross-motions for partial summary judgment[1] regarding whether the Federal Home Loan Bank Board (FHLBB) and the Federal Savings and Loan Insurance Corporation (FSLIC) entered into and breached express or implied contracts with plaintiff: 1) to treat goodwill acquired as the result of purchasing ailing savings and loan banks (thrifts), as an asset that might be counted toward meeting regulatory minimum capital requirements (supervisory goodwill); and 2) to continue according plaintiff this treatment for certain terms of years notwithstanding any future regulatory changes.

Plaintiff has moved for summary judgment that the Government is liable for damages caused by breaching such contracts.

Defendant cross-moves to dismiss counts 1, 2, and 3, the express and implied breach of contract and impossibility of performance claims of the complaint, for failure to state a claim and for lack of jurisdiction, arguing that determinations on the liability and

---

1. So-called "short-form" motions for summary judgment were required to be filed by Paragraph 5 of the Omnibus Case Management Order issued on September 18, 1996, by then-Chief Judge Loren A. Smith and by that court's subsequent order that the Government, apparently in each of the *Winstar* cases (whether or not a dispositive motion was pending, as far as can be told), show cause why summary judgment should not be entered against it in each case, on liability only. *See* December 22, 1997 opinion in *California Federal Bank v. United States*, 39 Fed.Cl. 753, 779 (1997) (granting plaintiff's motion for summary judgment; awarding damages) (*Cal.Fed.I*); *aff'd in part, rev'd in part and rem'd, California Federal Bank, FSB v. United States*, 245 F.3d 1342 (Fed.Cir.2001) (*Cal.Fed.II*). *See also* paragraph III of Procedural Order No. 1: Master Litigation Plan (August 11, 1997). Subsequent briefing, after the case was transferred to this judge, specifically addressed the applicability of collateral estoppel to plaintiff's breach of contract claims.

The preclusive scope of the show cause order (the extent to which the Government in subsequent dispositive motions was precluded from reliance on arguments or defenses rejected by the court in *Cal. Fed. I*) appears quite broad: the Government might not "raise issues that have been resolved by opinions in the original *Winstar* cases as clarified in this decision." *Id.* at 779. Plaintiff does not allege that any issue currently in contention has been precluded by the show cause order.

breach issues in *Charter Federal Savings Bank v. Office of Thrift Supervision (Charter I)*, 976 F.2d 203 (4th Cir.1992), *cert. denied*, 507 U.S. 1004, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993), preclude plaintiff from re-litigating its contractual claims in this court.

Defendant's motion to dismiss plaintiff's contract claims is granted, on grounds of issue preclusion; plaintiff's remaining claim, for violation of its due process rights under the Fifth Amendment to the United States Constitution, is dismissed for lack of jurisdiction.

## *Background*

This is one of approximately 120 cases brought in the United States Court of Federal Claims in the early to mid–1990's by savings and loan institutions seeking damages allegedly caused by the enactment and enforcement of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (FIRREA), which changed the regulatory minimum capital requirements, contrary to the Government's alleged promises to the individual banks that it would not to do so during the terms provided by their agreements to acquire failing thrift institutions. *See United States v. Winstar Corp.*, 518 U.S. 839, 843–861, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (deciding three such cases and providing an extensive discussion of the background of these cases). *See also Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995); (*Cal.Fed.II*).[2]

Between 1981 and 1985, First Federal Savings and Loan Association of Bristol (which later was acquired by Charter Federal Savings Bank, which, in turn, was ac-

quired by First American Corporation in December, 1995; the name then was changed to First American Federal Savings Bank) (together, or in the alternative, "Charter") purchased five thrifts that, like others in the industry, and notwithstanding numerous regulatory accommodations, were experiencing severe financial difficulties. These were caused, among other things, by inflationary pressures driving up the interest paid to depositors (at short-term rates), with no corresponding increase in the thrifts' lower, predominantly fixed income (reflecting the fixed rate of return on long-term, relatively low-cost, residential mortgages), as well as by government policies perversely encouraging thrift banks' risk-taking activities.[3]

Charter merged with two Virginia thrifts, Peoples Federal Savings and Loan Association (Peoples) and First Federal Savings and Loan Association of New River Valley (New River), in late 1981 and early 1982. In early 1985, Charter purchased New Federal Savings and Loan Association (New Federal), a conglomerate of five small Tennessee thrifts. In June 1985, it acquired Magnolia Federal Savings and Loan Association (Magnolia), another small Tennessee thrift.

All three transactions were proposed to Charter by federal regulators who were encouraging relatively healthier thrifts to acquire more financially troubled ones, and were consummated on substantially similar terms. The Government was not a signatory to any of the merger agreements and provided no financial assistance.

Charter received the proposal to acquire New River from a supervisory agent of the FHLBB in 1981. (The supervisory authority of the FHLBB, located in Washington, D.C.,

---

**2.** To the extent that it should become relevant in this case, this court is operating under the premise that, in a disagreement over an issue of law, one trial court is not bound by the prior rulings of a coordinate court, either in the same case (or cases) or in a different case involving the same legal issues, unless the ruling of the coordinate court has been affirmed by a higher court. That is, "law of the case". principles do not apply to such circumstances. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance . . .").

Of course, a party, by way of a case management agreement or otherwise, may waive a defense or argument in any case, *see United States v. Hitachi Am., Ltd.*, 172 F.3d 1319, 1334 (Fed.Cir.1999) (parties can waive defenses by agreeing not to assert them). The court up until this point has been directed to no instance of such waiver in this case.

**3.** *E.g.*, Salam, Ahmad W. and Tucker, James T.,*Congress, Regulators, RAP, and the savings and loan*, The CPA Journal Online (Jan.1994), *at* www.nysscpa.org/cpajournal/old/14979917.htm.

was distributed among 12 regional "Federal Home Loan Banks," the president of each of which was named the "supervisory agent" of thrifts in the region. 12 C.F.R. § 501.11.) Initially, Charter refused, considering the merger financially imprudent. A few months later, the supervisory agent proposed the acquisition of Peoples as well.

After discussions with the federal regulators, Charter entered into a single merger agreement with both thrifts, to which the Government was not a party. The agreement was conditioned upon the Government's approval of the use of the "purchase method" to account for the transaction.[4] The FHLBB, by a January 22, 1982 resolution, approved the merger (as then required by 12 U.S.C. § 1730(q)), contingent on Charter obtaining a letter from an independent accountant describing and substantiating the amount of, and indicating the allowed accounting treatment for, the goodwill created in the transaction.

In May 1982, Charter forwarded to the supervisory agent an accountant's letter indicating that the transaction created approximately $47.1 million in supervisory goodwill, which could be amortized using the straight-line method over a period of 40 years. The FHLBB subsequently approved the merger.

In early 1985, another Federal Home Loan Bank proposed that Charter acquire New Federal, a group of five failing Tennessee thrifts that had been created by the FSLIC and was managed by a FSLIC-appointed receiver. Charter signed the merger agreement with New Federal on March 29, 1985.

The FHLBB approved the New Federal merger application, conditioned, as before, on receipt of an independent accountant's letter describing the goodwill amount and the permissible accounting treatment of the merger. On April 2, 1985, the FHLBB issued a forbearance letter that exempted Charter from enforcement of the regulatory net worth requirements, in the event that it were unable to meet those requirements as a result of the merger, for a period of five years. A June 30, 1985 accountant's letter indicated that the acquisition resulted in $15 million in goodwill, which would be amortized over 15 years.

In June 1985, again at the FHLBB's behest, Charter acquired Magnolia, an insolvent thrift in Knoxville, Tennessee then under FSLIC receivership. The acquisition was authorized by an FHLBB resolution. FSLIC and Charter signed a transfer agreement on June 7, 1985. As in the prior transactions, the merger was accounted for by the purchase method, creating $24,000 in supervisory goodwill, to be amortized over a period of 15 years.

In 1989, in an effort to stabilize the thrift industry, Congress enacted FIRREA, which, among other reforms, phased out, over a five-year period, a thrift's ability to count supervisory goodwill toward the minimum regulatory core capital and risk-based capital requirements. *See* 12 U.S.C. § 1464(t). Because Charter could not meet the new capital requirements without including the entire amount of supervisory goodwill contemplated by the acquisition transactions, federal regulators imposed strict limitations on its financial dealings, including a prohibition on making any new loans or investments without prior written approval by the Government. These restrictions allegedly caused it to lose out on various business opportunities.

However, notwithstanding FIRREA's initially "devastating impact" upon Charter, it eventually negotiated an acceptable capital

---

4. Under generally accepted accounting principles (GAAP), an entity resulting from a merger or acquisition may elect between the "pooling method" of accounting treatment (in which the two former entities' assets and liabilities are fully merged) and the "purchase method" of accounting treatment. Under the latter, the excess of the purchase price (including assumed liabilities) over the fair market value of the acquired asset is treated as an intangible asset, called "goodwill," which may be amortized against income over a term of years. *See generally Winstar*, 518 U.S. at 848–49, 116 S.Ct. 2432. "Supervisory goodwill" refers to goodwill resulting from the purchase method in a merger sponsored by the FHLBB or FSLIC that could be counted towards satisfying the minimum capital requirements set by the regulatory agencies. *Id.* at 849, 116 S.Ct. 2432. By this device, liabilities became assets for regulatory purposes. The former 10-year limitation on the amortization period was eliminated by the FHLBB in favor of a 40–year maximum in August, 1981. For reasons unrelated to this suit, the amortization period was reduced to 25 years in 1984.

plan with the Office of Thrift Supervision (OTS), the new federal regulatory agency created by FIRREA to replace the FHLBB, and, as Charter puts it, "thrived in subsequent years and, in mid–1995, merged with First American Corporation." Pl.'s Mot. for Summ. J. at 15 n. 7.

### Procedural History

In August 1991, Charter filed an action in the United States District Court for the Western District of Virginia, seeking a declaratory judgment: 1) that the FHLBB entered into binding agreements to allow Charter to count supervisory goodwill towards regulatory capital requirements; 2) that the agreements were not abrogated by FIRREA's new regulatory minimum capital requirements; or, if they were, 3) that FIRREA was an intervening act frustrating performance of the contract and entitling Charter to rescission of the mergers. *See Charter I*, 773 F.Supp. 809, 815–16 (W.D.Va. 1991). Charter also sought to enjoin the OTS and the Federal Deposit Insurance Corporation (FDIC) from enforcing FIRREA, that is, from applying sanctions against it that would not apply had it continued to treat supervisory goodwill as an asset for regulatory capital purposes. *Id.*

Charter's other grounds for relief were claims that FIRREA effected a taking of its property for which the Government had not paid the compensation required by the Fifth Amendment to the Constitution, and that OTS violated the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*, in promulgating the relevant Thrift Bulletin implementing FIRREA. *See* Thrift Bulletin 38–2 (Jan. 9, 1990).

After considering affidavits and exhibits submitted by the parties, the district court was persuaded that Charter and the regulatory agencies had entered into a contract, but expressly "recognize[d] that the FHLBB did not promise not to alter its regulations in the future." *Id.* at 822. Nevertheless, it found the remedy of rescission appropriate, FIRREA constituting a supervening event making performance impossible. Upon rescission, the district court noted, the OTS would be required to treat the acquired thrifts as separate entities for purposes of meeting regulatory minimum capital requirements.

In lieu of ordering immediate rescission, however, the court warned that "any [future] enforcement action ... that substantially burdens plaintiff's operations, and which would not be taken by OTS and FDIC but for the use of supervisory goodwill according to the terms of the contract," would constitute a rescission of the contract and return the parties to their *status quo ante. Id.* at 827. The district court left the case open on its docket to give defendants the opportunity to decide what kind of enforcement action they wanted to take and to allow plaintiff thereafter to seek an enforcement hearing. *Id.*

In September 1992, the Court of Appeals for the Fourth Circuit "reversed the district court's decision on the merits and h[e]ld that the FHLBB did not contractually obligate itself(or its successor agencies) to permit Charter to use supervisory goodwill to meet capital requirements in the face of contrary new regulations." *Charter I*, 976 F.2d at 204, 211–13. Unlike in other similar supervisory goodwill cases (the court specifically distinguished *Winstar Corp. v. United States*, 21 Cl.Ct. 112, 116–17 (1990) and *Statesman Sav. Holding Corp. v. United States*, 26 Cl.Ct. 904 (1992), on their facts because, there, express contracts were found to exist), the court found that there existed "no evidence of an express contract in the merger documents in this case." *Id.* at 211.

The Fourth Circuit also pointed out that, although "[t]he FHLBB assured Charter that its use of supervisory goodwill was permissible under the then current law," the FHLBB "made no explicit promise to Charter of continued approval throughout the life of the amortization period." *Id.* at 212.

The Fourth Circuit, nonetheless, concluded: "However, we need not decide the contract issue because we find, in any event, that the FHLBB did not promise to exempt Charter from future capital regulations. We can assume, then, without deciding, the existence of an implied contract between the FHLBB (or OTS) and Charter and resolve the case on

the issue of contract interpretation." *Id.* at 211.

Specifically, the court invoked the so-called "unmistakability doctrine," a rule of commercial contract interpretation under which a sovereign government cannot be presumed to contract away, or waive, any of its unique sovereign powers, such as the right to enact legislation, unless the waiver is made in unmistakable terms. *Id.* (citing *Bowen v. Public Agencies Opposed to Social Sec. Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982)). The court noted that the unmistakability doctrine recently had been invoked by the D.C. and Eleventh Circuits, in two other *Winstar*-type cases, *Transohio Sav. Bank v. OTS,* 967 F.2d 598 (D.C.Cir.1992) and *Guaranty Fin. Services, Inc. v. Ryan,* 928 F.2d 994 (11th Cir.1991), respectively.

In 1995, plaintiff filed its complaint in this court, for damages caused by: 1) breach of [express] contract; 2) breach of contract implied in law; 3) frustration of purpose, or commercial impracticability excusing performance under the contract; and 4) an unconstitutional taking of property in violation of due process effected by the passage and enforcement of FIRREA.

Plaintiff has moved for partial summary judgment that contracts to allow the use of supervisory goodwill were formed in connection with each acquisition, and that, as a matter of law, the passage of FIRREA breached them. Thus, in plaintiff's view, the only issue to be decided here is damages.

Defendant opposes plaintiff's partial summary judgment motion, and requests, instead, that the court dismiss plaintiff's contract claims (counts 1, 2, and 3) for failure to state a claim upon which relief may be granted, *see* Rule 12(b)(4)[5] of the Rules of the United States Court of Federal Claims (RCFC), based on the *res judicata* effect of the Fourth Circuit's decision in *Charter I.* Defendant contends that counts 2 and 4 also should be dismissed, albeit under RCFC 12(b)(1), because this court has no jurisdiction over claims for breaches of contracts implied in law,[6] or over due process violations.

Plaintiff rejoins that the issue preclusion doctrine is inapplicable, either because the issues are not the same, or because a "change in the legal atmosphere" has occurred since the Fourth Circuit's decision.

### *Standard of Review*

On a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), or for failure to state a claim upon which relief may be granted under RCFC 12(b)(6), the court must construe the well-pled allegations in the complaint favorably to the pleader. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pixton v. B & B Plastics, Inc.,* 291 F.3d 1324, 1326 (Fed. Cir.2002); *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed. Cir.1988).

The court will deny a motion to dismiss for failure to state a claim unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Leider v. United States,* 301 F.3d 1290, 1293 (Fed.Cir.2002).

"A party seeking the exercise of jurisdiction in its favor has the burden of establishing that such jurisdiction exists," *Awad v. United States,* 301 F.3d 1367, 1375 (Fed.Cir. 2002) (quoting *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991)), and must establish jurisdiction by a preponderance of the evidence, *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988).

Under RCFC 56(c), a motion for summary judgment will be granted if, after drawing all

---

**5.** The Rules of the United States Court of Federal Claims were amended as of May 2, 2002, to, *inter alia,* redesignate Rule 12(b)(4) as Rule 12(b)(6), for consistency with the Federal Rules of Civil Procedure.

**6.** Plaintiff's brief filed on January 12, 2001, requests the court to treat count 2 of the complaint as a claim for breach of contract implied in fact, not in law. Because the court has no jurisdiction over contracts implied in law, the request is granted.

reasonable inferences in favor of the non-movant, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Eagle Comtronics, Inc. v. Arrow Commun. Labs., Inc.*, 305 F.3d 1303, 1313 (Fed.Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Castle v. United States*, 301 F.3d 1328, 1336–37 (Fed.Cir.2002)).

The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1356 (Fed.Cir.2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Bayer AG v. Carlsbad Tech., Inc. (Bayer Corp.)*, 298 F.3d 1377, 1379–80 (Fed.Cir.2002).

## DISCUSSION

### Principles of Res Judicata

Defendant argues that the decision of the Fourth Circuit on the breach of contract issues before it in *Charter I* is res judicata, precluding plaintiff's breach of contract claims in this case.

*Res judicata* historically has referred to the overall doctrine of finality or litigation preclusion, which generally provides that a matter finally decided by one tribunal may not be redetermined subsequently by another. *See Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *United States v. Moser*, 266 U.S. 236, 241–42, 45 S.Ct. 66, 69 L.Ed. 262 (1924); *Southern P.R. Co. v. United States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897).

More recently, the term *res judicata* has been used to refer only to the preclusion on redetermining the same *claims* for relief (or causes of action) while the term collateral estoppel means the finality principle that bars redetermination of *issues*.[7] *United States v. Mendoza*, 464 U.S. 154, 158, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Faust v. United States*, 101 F.3d 675, 677 (Fed.Cir. 1996); *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir. 1983) (citing Restatement (Second) of Judgments § 27 (1980)).

■ The purposes of issue preclusion include: protecting litigants and the judicial system from the cost, expense, and other burdens of re-litigating issues previously decided; avoiding the perception of unfair administration of the laws; and providing citizens in a free market democracy with the certainty needed to manage their affairs properly. *See Mendoza*, 464 U.S. at 158, 104 S.Ct. 568; *Montana v. United States*, 440 U.S. 147, 154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Parklane Hosiery*, 439 U.S. at 326, 99 S.Ct. 645. "Affording a litigant more than one full and fair opportunity for judicial resolution of the same issue results in an untenable misallocation of resources." *Arkla, Inc. v. United States*, 37 F.3d 621, 623 (Fed.Cir. 1994) (citing *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 328–29, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)).

■ Issue preclusion prevents "a second bite of the apple" when: "1) the issues to be concluded are identical to those involved in the prior action; 2) in that action, the issues were raised and 'actually litigated;' 3) the determination of those issues in the prior action was necessary and essential to the resulting judgment; and 4) the party precluded was fully represented in the prior action" and had a "full and fair chance to litigate." *Mother's Restaurant*, 723 F.2d at 1569 (citing *Blonder–Tongue Labs.*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788).

An issue is considered to have been "raised and actually litigated" in a prior action when it was properly raised by the pleadings, was submitted for determination, and was determined. *Banner v. United States*, 238 F.3d 1348, 1354 (Fed.Cir.2001). *See also Mother's Restaurant*, 723 F.2d at 1570–71 (issue preclusion applies when "parties to the original

---

7. The Restatement (Second) of Judgments § 27 (1980) indicates that the term "issue preclusion" is preferable to collateral estoppel. *See Mother's Restaurant*, 723 F.2d at 1569 n. 3.

action disputed the issue and the trier of fact resolved it.") (quoting *Continental Can Co. v. Marshall*, 603 F.2d 590, 596 (7th Cir.1979)).

To be "necessary and essential to the resulting judgment," a determination or finding in a prior action "need not be so crucial that, without it, the judgment could not stand," but must be more than "the incidental or collateral determination of a nonessential issue." *Id.* at 1571. A "full and fair chance to litigate" may be inferred from representation by counsel who makes legal and factual arguments that are considered by the tribunal. *Allen v. McCurry*, 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

▮ Unlike *res judicata*/claim preclusion, and as the names imply, an issue previously decided may be precluded even when the two proceedings were not based on the same claim for relief or cause of action. *Parklane Hosiery*, 439 U.S. at 326 n. 5, 99 S.Ct. 645.

### The Parties' Arguments

Charter does not dispute that the latter three conditions in *Mother's Restaurant* apply here,[8] arguing instead that issue preclusion is inapplicable because: 1) the issue before this court is not identical to the issue involved in *Charter I;* and 2) the decisions in *Winstar* and its progeny constitute an intervening "change in controlling legal principles," or a "change in legal atmosphere," or present other "special circumstances" entitling plaintiff to an exception from the estoppel bar.

Charter argues that the "issues" in the two cases are not identical because: 1) plaintiff sought different remedies—the case in the Fourth Circuit sought injunctive relief, while this one demands money damages and 2) the Fourth Circuit did not decide but merely assumed, the formation or existence of contracts for favorable treatment of supervisory goodwill and did not decide damages, while the principal issues in this case are, precisely, whether such contracts were formed and what damages are payable for their breach.

Charter maintains that, because the unmistakability doctrine, relied upon by the Fourth Circuit to deny defendant's breach of contract liability, purportedly was rejected in the Supreme Court's intervening decision in *Winstar,* issue preclusion does not apply to the Fourth Circuit's denial of defendant's liability to plaintiff.[9]

Defendant's position is that the major dispositive issue underlying the claim in both cases is the same—whether the Government agreed to and breached a contract to permit plaintiff to count supervisory goodwill toward minimum capital requirements for regulatory purposes notwithstanding any subsequent change in the legal regime—and that plaintiff may not recover in this court merely by establishing contract formation, which it alleges to be the only issue not precluded by *Charter I,* but also must establish the issue that the Fourth Circuit clearly decided in defendant's favor, the occurrence of a breach of contract.

The Government also argues that, in fact, there has been no intervening or supervening "change in the legal atmosphere," because a plurality of the Supreme Court did not bar reliance on the unmistakability rule of contract interpretation for government contracts in all circumstances.

Also, even if the unmistakability doctrine were rejected, defendant argues, the "change in controlling legal principles" exception applies only in narrow circumstances, predominantly in multi-year tax and benefit cases, where, unlike here, precisely the same transaction or factual circumstances are not involved.

Moreover, defendant contends, even if the Fourth Circuit erroneously relied on unmistakability rather than other rules of contract interpretation in concluding that the Government did not breach a contract to permit temporally-unlimited use of supervisory

---

8. Issues not raised are waived. *See Novosteel SA v. United States,* 284 F.3d 1261, 1274 (Fed.Cir. 2002) (the parties must give a trial court a fair opportunity to rule on an issue by raising it in their principal brief).

9. The Supreme Court refused the opportunity to decide the specific issue of unmistakability in *Charter I. Charter I, cert. denied,* 507 U.S. 1004, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993).

goodwill as capital for regulatory purposes, a mere error of law does not justify setting aside principles of collateral estoppel, or a prior decision precluded by such principles. Rather, the proper remedy for an incorrect ruling by a court is appeal, which was attempted in this case, unsuccessfully, on that very issue.

### Different Issues

■ It is clear that an "issue" for purposes of collateral estoppel is not limited to a finding of fact, but also extends to an issue of law. *See Arizona v. California,* 530 U.S. 392, 414–15, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) (issues of law or fact may be precluded); *Baker v. General Motors Corp.,* 522 U.S. 222, 118 S.Ct. 657, 139 L.Ed.2d 580 (1996) (same). *See also New Hampshire v. Maine,* 532 U.S. 742, 748–49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) *reh. denied,* 533 U.S. 968, 122 S.Ct. 10, 150 L.Ed.2d 793 (2001); *U.S. v. Stauffer Chemical Co.,* 464 U.S. 165, 171, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984); *Montana,* 440 U.S. at 153, 99 S.Ct. 970 (1979).

Charter argues that the issue in *Charter I* is different because the issue here is contract formation, whereas the Fourth Circuit expressly stated that it was not deciding the issue of contract formation: "Since our case involves no written expression of intent to contract nor any written contracts between the parties, we are reluctant to rule that a contract exists. However, we need not de-cide the contract issue because we find, in any event, that the FHLBB did not promise to exempt Charter from future capital regulations." *Charter I,* 976 F.2d at 211.

However, there can be no doubt that, in order to prevail in this case, plaintiff must establish that the Government promised to permit it to count supervisory goodwill toward regulatory capital in the face of conflicting future regulations. In this case, it alleges (in counts 1, 2, and 3 of the complaint) that "Charter and agencies of the United States entered into valid and binding enforceable contracts" and that the Government "breached these contracts by unilaterally revoking an essential term of that agreement, namely the right of Charter to treat the supervisory goodwill as an asset for reg-ulatory purposes to be amortized over a ex-tended period of time." Complaint at 13, 14. Similarly, at the trial level in *Charter I,* the court described plaintiff as arguing that "it made a contract with the FHLBB for the use of supervisory goodwill, and the contract was abrogated by FIRREA." *Charter I,* 773 F.Supp. at 815.

And there also is no doubt that the court in *Charter I* held that the Government made no such promise. First, it defined the issues: "Our review is limited to whether a contract existed between Charter and FHLBB (or its replacement agency, OTS); and, if so, wheth-er the contract provided that Charter could treat supervisory goodwill as capital during the entire specified amortization period." *Charter I,* 976 F.2d at 210. Then, it held that "the FHLBB did not promise to exempt Charter from future capital regulations." *Id.* at 211–213.

■ To recover for breach of contract, a party must allege and establish: 1) a valid contract between the parties; 2) an obligation or duty arising out of the contract; 3) a breach of that duty; and 4) damages caused by the breach. *See San Carlos Irri-gation & Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed.Cir.1989). Therefore, it is irrelevant that a contract exists if it does not impose a particular duty. A breach of contract is a failure to perform a contractual duty when it is due. *Winstar,* 64 F.3d 1531, 1545 (Fed.Cir.1995). Without a duty, there can be no breach, and without a breach, the court need not reach the question of whether there is a valid contract. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997).

■ Charter cannot prove here the obligation or duty arising out of a contract with the Government to provide the regulatory goodwill treatment desired by Charter in the face of contrary future regulations because that very issue was decided against it by the Fourth Circuit: "the FHLBB did not con-tractually obligate itself (or its successor agencies) to permit Charter to use superviso-ry goodwill to meet capital requirements in the face of contrary new regulations." *Char-ter I,* 976 F.2d at 204.

Thus the essential issue in both cases—whether there was a supervisory goodwill contract containing the promise relied upon by plaintiff—was presented to both courts, and decided by the Fourth Circuit adversely to plaintiff. Plaintiff's attempt to distinguish the issues in the two proceedings must be rejected "on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue *identical in substance* to the one he subsequently seeks to raise." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) (emphasis added).

### Different Claims—Equitable v. Legal

Charter's argument that the issues differ because the remedies or forms of action vary—one being in equity for an exemption from regulatory enforcement, the other at law, for monetary contract damages, ignores that defendant here is not relying on "claim for relief" preclusion (*res judicata*) but, rather, on issue preclusion.

■ Issue preclusion applies regardless of differences in relief, so long as the other prerequisites for collateral estoppel exist. *Sunnen*, 333 U.S. at 597, 68 S.Ct. 715 (1948); *Southern P.R. Co.*, 168 U.S. at 48, 18 S.Ct. 18 ("right, question, or fact, once ... determined," is conclusive even in a different cause of action).

The principle antedates this court and its predecessors:

> [A] verdict and judgment of a court of record, or a decree in chancery, although not binding upon strangers, puts an end to all further controversy concerning the points thus decided between the parties to such suit. *In this there is, and ought to be, no difference between a verdict and judgment in a court of common law and a decree of a court of equity.* They both stand on the same footing, and may be offered in evidence under the same limitations, and it would be difficult to assign a reason why it should be otherwise.

*Smith v. Kernochen*, 48 U.S. 198, 218, 7 How. 198, 12 L.Ed. 666 (1849) (emphasis added)

(quoting *Hopkins v. Lee*, 6 Wheat. 109, 19 U.S. 109, 114, 5 L.Ed. 218 (1821). *See also* Restatement (Second) of Judgments § 27 (1982)) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, *whether on the same or a different claim.*") (emphasis added); 1B. J. Moore, *Federal Practice* ¶ 0.405[1] (2d ed.1974).

### Change in Controlling Legal Principles

■ The Court of Appeals for the Federal Circuit, like the Supreme Court and several other courts, has recognized a limited exception to the collateral estoppel principle "when there has been a change in the applicable law between the time of the original decision and the subsequent litigation in which collateral estoppel is invoked." *Bingaman v. United States*, 127 F.3d 1431, 1437–38 (Fed.Cir.1997) (citing *Sunnen*, 333 U.S. at 599, 68 S.Ct. 715); *see also Montana*, 440 U.S. at 162, 99 S.Ct. 970 (when "controlling facts or legal principles have changed significantly ... or other special circumstances warrant"); Restatement (Second) of Judgments § 28(2)(b) (1982).

Charter argues that the Supreme Court's decision in *Winstar* constituted an intervening "change in legal circumstances" because it allegedly rejected the Government's right to invoke the unmistakability rule in interpreting government contracts. However, the positions of the Supreme Court Justices on the continued viability of the unmistakability defense (as the Federal Circuit pointed out in *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1577–80 (Fed.Cir.1997)) are not so easily categorized. In fact, a plurality of the Justices did *not* reject the applicability of the rule. *See Winstar*, 518 U.S. at 910, 116 S.Ct. 2432 (Breyer, J., concurring); *id.* at 919, 116 S.Ct. 2432 (Scalia, J., Thomas, J., Kennedy, J., concurring); *id.* at 924, 116 S.Ct. 2432 (Rehnquist, C.J., Ginsburg, J., dissenting).

The "change in legal circumstances" exception, moreover, despite the broad language of the holding in some cases, has been applied, as in *Bingaman*, almost exclusively to a nar-

row set of cases, such as tax and benefits cases, in which the facts are not the same because they involve a new or different return or application, even though based on similar (but not identical) facts, made in or as to different years. The more suitable grounds for an exception in these situations may very well be the more explicitly fairness-based "special circumstances" exception, rather than the "changed" or "supervening" "legal circumstances" exceptions, since the former involve circumstances where, to permit the estoppel as to one benefit-seeker, would be unfair to large numbers of similarly-situated others who could not rely on such estoppel. Interestingly, the prior determination sought to be given preclusive effect in these cases was not a judicial one at all, but only an administrative determination.

In the case of Mr. Bingaman, for example, although his work duties had not materially changed from one period to another, the Federal Circuit found that the Merit System Protection Board's use of a narrower definition of "law enforcement officer" than previously applied constituted a "change in the legal atmosphere" that barred plaintiff from relying on collateral estoppel to prevent the Government from changing the earlier, more lenient, retirement eligibility standards as they applied to him. *Bingaman,* 127 F.3d at 1437.

Similarly, in *Sunnen,* the plaintiff taxpayer obtained a benefit in one taxable year and then sought to retain it in subsequent taxable years, by means of collateral estoppel, even though the law governing entitlement to the benefit had changed. The "change in legal circumstances" exception was applied to prevent such use of collateral estoppel. *Sunnen,* 333 U.S. at 599, 68 S.Ct. 715.

Although a taxpayer's financial situation may not have changed materially from one year to the next, each year is deemed to present a different set of facts under the Internal Revenue Code. That is because taxable years legally are considered separate events for most purposes. *See Houston Indus. v. United States,* 78 F.3d 564, 568 (Fed.

Cir.1996) (Each tax year is "the origin of a new liability and of a separate cause of action") (quoting *Sunnen,* 333 U.S. at 598, 68 S.Ct. 715). As *Sunnen,* 333 U.S. at 599, 68 S.Ct. 715, and *Limbach,* 466 U.S. at 364–64, 104 S.Ct. 1837, both expressly hold, the collateral estoppel bar in these tax cases was lifted on account of an intervening "change in the legal atmosphere" only when the two cases involved *different* taxable years.

To accord these plaintiffs continued benefits in the face of different rules being applied to similarly-situated taxpayers/benefit applicants, etc., would result in unfair administration of the laws. As the court in *Montana,* stated: "If [a prior] determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class. As a result, there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion. [Collateral estoppel] is not meant to create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers." 440 U.S. at 161, 99 S.Ct. 970 (quoting *Sunnen,* 333 U.S. at 599, 68 S.Ct. 715).

The cases cited by plaintiff in support of the application of the "change in legal circumstances" exception are eminently distinguishable on their facts from those at hand, mostly because they fall under one of the categories just discussed. The majority involve multi-year tax returns, as in *Sunnen,* see, e.g., *Limbach v. Hooven Allison Co.,* 466 U.S. 353, 104 S.Ct. 1837, 80 L.Ed.2d 356 (1984); *American Nat'l Bank of Austin v. United States,* 216 Ct.Cl. 92, 573 F.2d 1201 (1978); *Texaco, Inc. v. United States,* 217 Ct.Cl. 416, 579 F.2d 614 (1978); *CBN Corp. v. United States,* 176 Ct.Cl. 861, 364 F.2d 393 (1966). Another significant category comprises multi-year benefit determinations, *see Bingaman; B.N. Spradling v. City of Tulsa,* 198 F.3d 1219 (10th Cir.2000).[10] In all cases,

**10.** The remaining cases cited by plaintiff also involve different transactions/facts. *E.g., Sohio Transp. Co. v. United States,* 5 Cl.Ct. 620, 637–38

(1984) (two different applications for rights of way across public lands); *Prejean v. Foster,* 227 F.3d 504 (5th Cir.2000) (two distinct instances of

unlike here, the facts in the subsequent suit differ from the facts litigated in the original proceeding. *See also* Restatement (Second) of Judgments § 28 cmt. c, illus. 3 (1982) (second litigation concerning conduct that occurred *after* the first judgment not precluded).

As the Third Circuit pointed out in *O'Leary v. Liberty Mutual Ins. Co.*, 923 F.2d 1062 (3d Cir.1991), even an unambiguous change in law between the state court and the district court actions does not entitle plaintiff to the benefit of evolving jurisprudence when seeking recovery for the same injury in both courts. Otherwise, the exception based on changed legal atmosphere "would swallow the general rule, greatly undermining the twin goals of collateral estoppel—the avoidance of repetitive litigation and the promotion of finality of judgments." *Id.* at 1069.

In sum, Charter cites, and this court has found, no authority for the improbable proposition that an exception has been created freeing a party to re-litigate the same issue, arising from identical facts, merely because there is a subsequent change in the law. This would eviscerate the concept of res judicata, enormously increase the volume of litigation (in our already overly-litigious society), and create general havoc, in the courts and society at large.

Rather, the authorities plaintiff cites illustrate that the limited circumstances when the "change in legal atmosphere" exception has been applied (almost exclusively against a citizen by the government) when it is necessary to ensure fairness to other similarly-situated citizens who could *not* use collateral estoppel to lock in a favored treatment from a prior year, and only when the legal "atmosphere" *and* the transactional facts (e.g., tax year, benefit period) are different. These circumstances do not exist here.

### Mistake

Even if the Fourth Circuit was mistaken in its application or use of the unmistakability doctrine, this would not rob its determinations on this issue of preclusive effect.[11]

"Collateral estoppel does not turn upon a determination that a prior ruling was correctly rendered...." *Arkla, Inc. v. United States*, 37 F.3d 621, 626 (Fed.Cir.1994) (quoting *Laaman v. United States*, 973 F.2d 107, 112 (2d Cir.1992)). "[A] fact, question or right distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law." *Moser*, 266 U.S. at 242, 45 S.Ct. 66. *See also Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 913 (9th Cir.1997) (even if the earlier decision were found to be erroneous by the Supreme Court, collateral estoppel could not be precluded when the facts were the same). Indeed, collateral estoppel would lose all purpose (never be invoked) if it could be disregarded merely because the later court disagreed with the prior court's resolution of an issue finally decided, whether of law or fact.

### Non–Contractual Claims

Plaintiff's claim for an unconstitutional taking of property in violation of due process is dismissed because this court lacks jurisdiction to review claims for due process

redistricting), *United States v. Graham*, 169 F.3d 787 (3d Cir.1999) (two separate unlawful reentries into the country); *State Farm Mut. Auto. Ins. Co. v. Duel*, 324 U.S. 154, 65 S.Ct. 573, 89 L.Ed. 812 (1945) (licensing for insurance companies in two different periods); *Wilson v. Turnage*, 791 F.2d 151 (Fed.Cir.1986) (the legality of a suspension versus entitlement to legal fees incurred since the suspension). *See also Graphic Communications Int'l Union, Local 554 v. Salem–Gravure*, 843 F.2d 1490 (D.C.Cir.1988) (OSHA inspection at two different locations). Plaintiff's reliance on *Transcapital Fin. Corp. v. OTS*, 44 F.3d 1023 (D.C.Cir.1995) also is misplaced. That court refused to give preclusive effect to *Transohio Sav. Bank v. OTS*, 967 F.2d 598

(D.C.Cir.1992) because it was an earlier, interlocutory stage of the same case, not due to an exception to issue preclusion, which was not discussed.

11. The issue could have been decided adversely to plaintiff without recourse to the doctrine of unmistakability, based merely on ordinary principles of contract construction, according to Justice Scalia in *Winstar*, 518 U.S. at 920, 116 S.Ct. 2432 ("the [unmistakability] doctrine has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation.").

**132**

under the Fifth Amendment to the Constitution. *See Crocker v. United States*, 125 F.3d 1475 (Fed.Cir.1997); *Montalvo v. United States*, 231 Ct.Cl. 980, 982–83 (1982).[12]

### CONCLUSION

Regardless of any difference in outcome in subsequent similar cases, including *Winstar* and its progeny, based on changing and evolving legal doctrine, plaintiff is barred from re-litigating the issue actually and necessarily determined by the Fourth Circuit, of whether the Government promised to permit Charter to count supervisory goodwill for regulatory capital purposes even in the face of a change in the regulatory regime.

Accordingly, defendant's motion to dismiss counts 1, 2, and 3 of the complaint is granted on grounds of collateral estoppel. Defendant's motion to dismiss count 4 is granted for lack of jurisdiction over claims under the Due Process Clause of the Fifth Amendment. The clerk shall enter judgment for defendant. No costs.

---

**12.** The result would be no different if, instead of the alleged due process violation, Charter had alleged a taking without just compensation under the Fifth Amendment to the Constitution, as the Federal Circuit recently held that the passage and implementation of FIRREA effected no Fifth Amendment taking without just compensation in a similar, *Winstar*-related case. *Castle v. United States*, 301 F.3d 1328, 1342–43 (Fed.Cir.2002).